Dye, J.
The crucial question is whether a standard New York State crossroad sign erected by the State pursuant to an order of the State Traffic Commission on a county road at its intersection with a State road was reasonably adequate under the circumstances, or was the State, in the discharge of its duty to warn against highway hazards, required to erect in addition to the standard crossroad sign a “ Stop ” sign.
The question comes to us in an appeal as of right by the State from six separate judgments of the Court of Claims, entered upon orders of the Appellate Division, Third Department, which unanimously reversed on the law and the facts, judgments of the Court of Claims, dismissing the claims, and directed the entry of judgments in favor of each of the claim *5 ants in stated amounts. The actions arose out of the collision of two automobiles at the intersection of a macadamized county road, 18 feet in width and known as the Keeney Settlement Road, and a two-lane concrete highway, 22 feet in width, described as New York State Route 13, in the town of Cuyler, Cortland County, New York, respectively running in an east-west and north-south direction.
As Route 13 approaches the described intersection, it is elevated on a fill about 8 feet above the level of the surrounding area and makes a long sweeping curve to the east which is slightly banked so that the westerly edge of the concrete pavement is about 6 inches higher than the easterly edge. The county road is level at the point of intersection for a distance of about 25 feet beyond which it slightly upgrades, that is, .6 of a foot for 30 feet and .5 of a foot in the next 20 feet and then 1.3 of a foot in the next 50 feet. Commencing at the northwest corner of said intersection are concrete guideposts for a distance of 400 feet north along the west margin of Route 13 at the end of which is a standard crossroad warning sign. Concrete guideposts also extend from the intersection west along the north margin of the county road for a distance of 270 feet. Forty-three feet west of the intersection on the south shoulder of the county road was a standard New York State road marker bearing symbols “ N. Y. 13 L-R ”. This sign was visible at 500 feet and readable at 250 feet. One traveling easterly in the county road would be able to see from any point 300 feet west of the intersection a car 1,500 feet to' the north and 1,000 feet to the south on Route 13.
Prior to April, 1944 there had been stop signs on the county road at both its east and west approaches to Route 13. On March 31, 1944, pursuant to a State-wide survey made by the State Traffic Commission for the purpose of legalizing traffic signs in Cortland County, the commission issued its order to remove certain existing signs and authorized the erection of signs in locations where none had formerly existed. This was done pursuant to legislative authority (Vehicle and Traffic Law, art. 7) for the purpose of formulating and legalizing uniform highway safety programs and the adoption of uniform traffic signs, markers and signals throughout the State (Vehicle and Traffic Law, §§ 95-d, 95-g).
*6 Unchallenged engineer testimony was received showing that one of the main factors for the establishment of a stop sign is the sight distance across the corners for approaching motorists. Where the sight distance is open and unobstructed and deemed adequate, “ stop ” signs are not erected for the very good reason that the visibility itself is sufficient to give a motorist the necessary information in regard to the location of the intersection. Stop signs in such situations constitute an inconvenience which motorists are prone to disregard and disobey, an attitude which does not make for safety. On the other hand, where the sight distance is restricted, “ stop ” signs are erected.
In accordance with this practice the “ stop ” sign on the county road at its west approach was ordered removed by the State Traffic Commission and it was removed pursuant to such order in April, 1944. In its place the standard route marker, above described, was erected.
Over seven years later and on or about December 27, 1951 at about 3:30 to 4:00 e.m., an automobile driven by claimant’s intestate, Charlotte Sebring, age 17, and owned by the claimant, Carl D. Horton, in which claimant Daniel Edward Horton, age 20, was riding as a passenger, was proceeding at a speed of 20 to 25 miles per hour easterly in and through the county road. At the same time an automobile driven by claimant’s intestate, Merton Ladd, in which an infant claimant, William Ladd, then age 15, was riding as a passenger, was proceeding southerly at a speed of about 30 miles per hour in and through Route 13. 'Charlotte Sebring failed to stop at the intersection but drove her automobile without reducing speed on to Route 13 where it was immediately struck by the Ladd car. Both drivers were killed, the respective passengers severely injured and the vehicles demolished.
There were no eyewitnesses except the two passengers. The Sebring passenger, Horton, testified at the time the ear was proceeding 20 to 25 miles per hour. — that the speed was not reduced — that he did not see any signs — that he did not see Route 13 — that he saw the Ladd car when about one length away and it blew up. The Ladd boy testified ‘ ‘ we was just going along, I looked up * * * a little bit to the right, and that was all I saw * * *. Just, a black spot * * * snow was blowing * * * off and on it would stop ”.
*7 Findings made in .the Court of Claims .as to the described -physical .aspects and conditions .existing at the .time ¡stand unreversed, including that it was daylight at the time of the -accident-; that both roads were bare and dry; that it was not snowing but light snow was being blown by the wind; and that Charlotte Sebring failed to ¡stop at the intersection, but drove the car on to Route 13 without reducing speed, -where it was immediately struck by the Ladd ear. On appeal, the Appellate Division disapproved other findings made in the Court of Claims to the effect that .the physical features of the .area should have made the presence of an intersecting road apparent to Charlotte Sebring; that the route sign gave further warning of the presence of the intersection; that the fault lay with one -or both of the drivers involved and not with the .State.
There is, of course, no longer any question that the State is duty bound to warn users of its highways of existing hazards. When warning signs are so erected they must be reasonably adequate for the intended purpose (Murphy v. De Revere, 304 N. Y. 922; Nuss v. State of New York, 301 N. Y. 768; Vehicle and Traffic Law, § 9.5-d). Thus, we have held that failure to provide a stop sign at a “ T3 ’ intersection with a confusing traffic pattern constituted negligence on the part of the State (Eastman v. State of New York, .303 N. Y. 691). Likewise, we have held that where the .State failed —“ by signs adequate in number and placement, and appropriate in design — to give timely warning to [a] driver ” that he was approaching a narrowed, elevated and sharply curved railway bridge entrance constituting an “ uncommon danger ”, it was liable to the blame-free driver who sustains injuries as a result of the State’s negligence (Canepa v. State of New York, 306 N,. Y. 272, 277). In Applebee v. State of New York (308 N. Y. 502, 507), containing a review of eases where the State was held liable, it was pointed out that 1 ‘ The failure to maintain a stop sign, therefore, was found in each instance to be the very direct and proximate cause of the accident ”.
In the case at bar, on the other hand, the circumstances were such that the absence of a “ stop ” sign had no bearing on the happening of the accident. Here, the infant driver Sebring either failed to see, or saw and disregarded, an admittedly visible sign which should have made her aware, if nothing else would, that she was approaching a highway intersection.
*8 It may reasonably be inferred that had the infant driver Sebring paid attention to the road and signs thereon, she would have had “adequate ” warning of the existence of the intersection. Had she looked she would have seen ‘1 from any point 300 feet west of the intersection, a car 1500 feet to the north and 1000 feet to the south”. Since, allegedly, her speed was only 20 miles per hour, she should have been able, in the exercise of ordinary caution, to have slowed down or brought her car to a stop in ample time to avoid the collision. Having paid no attention to the physical indications that she was approaching an intersection — having disregarded the cement guideposts which were lined along the shoulders of Route 13 on both sides of the intersection, indicating the existence of an intersecting highway and having failed to concern herself with the information the route marker was designed to convey, there is not the slightest basis in this record for assuming that the infant driver would have paid more attention to a “ stop ” sign, had it been there, than she did to the existing sign.
The weight of the evidence plainly supports the finding of the trial court that there was no negligence on the part of the State contributing to the accident, but that the accident was caused by the failure of the infant driver to observe and heed the conditions then and there existing. This being so, liability of the State cannot be made to depend on its removal of a preexisting “ stop ” sign in 1944 at the approach to Route 13 from the west.
The rules requiring the erection of “ stop ” signs and other traffic signs (Manual of Uniform Traffic Control Devices) do not call for a “ stop ” sign at the intersection here involved. The rules provide that, in the absence of special circumstances, a “ stop ” sign should not be used at an intersection of an unimportant or local road with a main highway. It suggests the use of a route sign as a means of providing the necessary protection- There being no special circumstance, e.g., inadequate sight distances, requiring a “ stop ” sign, the placing of a route sign rather than a “ stop ” sign was in compliance with the requirements and does not constitute negligence on the part of the State. There was some evidence that several accidents occurred at the intersection between 1944 and the date of this accident. Yet, admittedly, “there is no factual proof of how *9 some of them occurred, and in some instances where there is proof, the circumstances differ from those here This being the case, I doubt whether such evidence was properly admitted, in view of the requirement that there has to be a showing of similar circumstances (Gastel v. City of New York, 194 N. Y. 15; Morrow v. Westchester Elec. Ry. Co., 172 N. Y. 638). Since all of the alleged accidents seem to have occurred prior to the time when the existing route marker was erected in 1951, they have no relevance to the issues here involved.
The judgments of the Appellate Division should be reversed and those of the Court of Claims reinstated, with costs.