[68 NE3d 693, 45 NYS3d 874]

ANTHONY TURTURRO, an Infant, by His Mother and Natural Guardian, ELIDA TURTURRO, et al., Respondents, v CITY OF NEW YORK, Appellant, et al., Defendants.

Argued November 15, 2016; decided December 22, 2016

470

472

**POINTS OF COUNSEL**

*Zachary W. Carter, Corporation Counsel*, New York City (*Susan P. Greenberg, Richard Dearing* and *Cecelia Chang* of counsel), for appellant.

*Gallagher, Walker, Bianco & Plastaras, Esqs.*, Mineola (*Robert J. Walker* of counsel), for respondents.

*Dennis M. Brown, County Attorney*, Hauppauge (*Christopher A. Jeffreys* of counsel), for County of Suffolk, amicus curiae. ■

*Harris Beach PLLC*, New York City (*Bradley M. Wanner* and *Andrew J. Orenstein* of counsel), for International Municipal Lawyers Association, amicus curiae.

**OPINION OF THE COURT**

FAHEY, J.

On this appeal, we are asked to determine whether the City of New York was acting in a proprietary or governmental capacity when it failed to conduct an adequate study of whether traffic calming measures should be implemented after it received numerous, repeated complaints of speeding on a Brooklyn roadway. We are also asked to determine whether the evidence was legally sufficient to uphold the jury's verdict regarding the issues of proximate cause and the City's qualified immunity.

We hold that because the acts or omissions claimed to have caused the injury were within the field of roadway design and safety, the City was acting in a proprietary capacity. Plaintiffs therefore had no obligation to prove the existence of a special duty. Furthermore, there was a rational process by which the jury could have concluded that the City's negligence was a proximate cause of the accident and that the doctrine of qualified immunity did not apply.

### I.

On December 5, 2004, plaintiff Anthony Turturro, then 12 years old, was riding his bicycle on Gerritsen Avenue in Brooklyn. At the time, Gerritsen Avenue was a straight, four-lane road running roughly north to south with two lanes of traffic going in each direction, divided by a double yellow line. In the relevant area, the western side of Gerritsen Avenue was bordered by storefronts, and the eastern side was bordered by parkland and recreational areas. The speed limit on Gerritsen Avenue was 30 miles per hour.

At approximately 6:30 p.m., Anthony attempted to cross Gerritsen Avenue on his bicycle in the middle of the block. He was struck by a vehicle traveling southbound on Gerritsen Avenue,

driven by defendant Louis Pascarella. Based on the skid marks found at the scene after the collision, a police investigation determined that Pascarella was traveling at a speed of at least 54 miles per hour before the collision. Anthony survived, but with serious injuries. Pascarella subsequently pleaded guilty to assault in the second degree for recklessly causing serious physical injury to Anthony. Plaintiffs commenced this negligence action against the City, Pascarella, and the owner of the vehicle Pascarella was driving.

During trial, plaintiffs presented evidence that the City had received several letters from local residents, including children, and elected officials between 2002 and 2004 complaining of speeding on Gerritsen Avenue, some of which stated that the roadway was being used for "drag racing" and was being treated as a "racetrack." Several individuals requested traffic signals to curb the speeding. Some requested a traffic study. Those complaints were routed to the Intersection Control Unit (ICU) of the Department of Transportation (DOT). Plaintiffs' witnesses testified that the role of ICU was to study particular intersections and determine whether those intersections needed installation of traffic signals or alteration of existing signals. ICU conducted four studies of three intersections on Gerritsen Avenue before Anthony's accident—two studies in 2002 and two in 2004. Three of the four ICU studies also examined the approach speed of vehicles traveling through the particular intersection that was the subject of the study. ICU found that many vehicles were speeding at each of the intersections studied. ICU notified police of the speeding problem after each study.

Plaintiffs also presented evidence that ICU did not study speeding along an entire stretch of roadway. The Brooklyn Borough Engineer at the time of the accident testified that such a speed study would have examined speeding on the roadway during off-peak hours, DOT would have notified the police if it discovered speeding during such a study, and if police enforcement of the speed limit did not alleviate the problem, the issue would have been referred to the Planning Unit of DOT, which was responsible for implementing "traffic calming" measures on the City's roadways. Traffic calming measures are intended to lower the overall speed on a particular roadway by modifying driver behavior so that drivers are more likely to drive at or close to the speed limit. Such measures include speed humps, narrowed lanes, rumble strips, roundabouts, and raised crosswalks, among others.

Plaintiffs' expert testified that people generally drive more slowly where traffic calming methods have been implemented because such measures make drivers more cautious. The evidence presented at trial demonstrated that before Anthony's accident, the City had not conducted a study of potential traffic calming measures that could be used to address the problem of vehicles speeding along a stretch of Gerritsen Avenue. Plaintiffs' expert testified that laypeople often request traffic signals to curb speeding on a particular roadway, but that it was well known among traffic engineers that traffic signals do not control speed and could even exacerbate the problem. Significantly, plaintiffs' expert pointed out that the four ICU studies, which considered whether traffic control devices should be installed at particular intersections, did not study the problem of speeding along Gerritsen Avenue as a whole, making them inadequate to address that issue. In addition, according to plaintiffs' expert, once ICU determined that there was a speeding problem on Gerritsen Avenue and referred the issue to the police for enforcement of the speed limit, the City should have followed up to determine whether police enforcement had resolved the issue. If police enforcement was not controlling the speeding, plaintiffs' expert opined that the City should have conducted a traffic calming study and implemented traffic calming measures to reduce speeding.

The City's expert, by contrast, opined that ICU's studies and its referral of the speeding problem to police constituted an adequate response to complaints of speeding on Gerritsen Avenue. The City's expert testified that the accident rate and the average speed for Gerritsen Avenue were not abnormally high. The City also presented testimony from a DOT traffic engineer that the ICU studies contained "elements" of traffic calming. The engineer further testified, however, that "pure" traffic calming studies ordinarily were done by the Planning Unit of DOT, not ICU, and that after referral of the speeding problem to police, ICU generally did not follow up to determine whether police enforcement of the speed limit was successful unless there was another request for a traffic signal at a particular intersection.

After trial, the jury returned a verdict finding that Anthony, Pascarella, and the City were negligent, and that the negligence of each of them was a substantial factor in causing injury. The jury apportioned 10% of the liability to Anthony, 50% to Pascarella, and 40% to the City.

The City moved to set aside the verdict pursuant to CPLR 4404, arguing that it was entitled to qualified immunity because the ICU studies were adequate to address the problem of speeding on Gerritsen Avenue, and that its failure to conduct a traffic calming study or implement traffic calming measures was not a proximate cause of the accident. The City subsequently filed supplemental motion papers, in which it argued that the City was acting in a governmental capacity and therefore plaintiffs were required to prove special duty, or, in the alternative, that the City was not liable pursuant to the governmental function immunity doctrine.

Supreme Court denied the City's motion to set aside the verdict as to liability, but granted a new trial unless plaintiffs stipulated to a reduced damages award, which they did. Judgment was entered in plaintiffs' favor.

On appeal, the Appellate Division modified, by deleting the award to plaintiff Elida Turturro, Anthony's mother, for loss of services, and by remitting for a new trial on damages unless plaintiffs consented to a further reduction of the damages award, and otherwise affirmed the judgment (*see Turturro v City of New York*, 127 AD3d 732, 733-734 [2d Dept 2015]). The Appellate Division rejected the City's contention that it was acting in a governmental capacity and therefore held that plaintiffs had no obligation to prove special duty (*see id.* at 735). The Court further held that there was a rational process by which the jury could have concluded that the City was not entitled to qualified immunity and that the City's negligence was a proximate cause of the accident (*see id.* at 735-738).

Plaintiffs stipulated to the Appellate Division's reduced damages award and an amended judgment was entered. This Court granted the City leave to appeal (*Turturro v City of New York*, 26 NY3d 908 [2015]). We now affirm.

## II.

"When a negligence claim is asserted against a municipality, the first issue for a court to decide is whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose" (*Applewhite v Accuhealth, Inc.*, 21 NY3d 420, 425 [2013]). "A government entity performs a purely proprietary role when its 'activities essentially substitute for or supplement traditionally private enterprises' " (*id.*, quoting *Sebastian v State of New York*, 93 NY2d 790, 793 [1999]). "In contrast, a municipality will be

deemed to have been engaged in a governmental function when its acts are 'undertaken for the protection and safety of the public pursuant to the general police powers' " (*id.*, quoting *Sebastian*, 93 NY2d at 793).

Although certain municipal actions have long been held to fall definitively on one side or other of the proprietary/governmental line, "this dichotomy is easier to state than to apply in some factual scenarios" and "may present a close question for the courts to decide" (*id.*). In *Miller v State of New York* (62 NY2d 506 [1984]), this Court observed:

> "A governmental entity's conduct may fall along a continuum of responsibility to individuals and society deriving from its governmental and proprietary functions. This begins with the simplest matters directly concerning a piece of property for which the entity acting as landlord has a certain duty of care, for example, the repair of steps or the maintenance of doors in an apartment building. The spectrum extends gradually out to more complex measures of safety and security for a greater area and populace, whereupon the actions increasingly, and at a certain point only, involve governmental functions, for example, the maintenance of general police and fire protection" (*id.* at 511-512).

"The relevant inquiry in determining whether a governmental agency is acting within a governmental or proprietary capacity is to examine 'the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred' " (*Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d 428, 447 [2011], *rearg denied* 18 NY3d 898 [2012], *cert denied sub nom. Ruiz v Port Auth. of N.Y. & N.J.*, 568 US —, 133 S Ct 133 [2012], quoting *Miller*, 62 NY2d at 513). In other words, "the determination of the primary capacity under which a governmental agency was acting turns solely on the acts or omissions claimed to have caused the injury" (*World Trade Ctr.*, 17 NY3d at 447).

If a municipality was acting in a governmental capacity, then the plaintiff must prove the existence of a special duty (*see Applewhite*, 21 NY3d at 426). Even if a plaintiff satisfies that burden, a municipality acting in a discretionary governmental capacity may rely on the "governmental function immunity defense" (*Valdez v City of New York*, 18 NY3d 69, 75 [2011]).

That defense provides immunity for the exercise of discretionary authority during the performance of a governmental function (*see id.* at 75-77; *McLean v City of New York*, 12 NY3d 194, 202-203 [2009]).

As the name "governmental function immunity defense" implies, the defense is available only when it has first been determined that the municipality was acting in a governmental capacity. The defense "shield[s] public entities from liability for discretionary actions taken *during the performance of governmental functions*" (*Valdez*, 18 NY3d at 76 [emphasis added]). The governmental function immunity defense has no applicability where the municipality has acted in a proprietary capacity, even if the acts of the municipality may be characterized as discretionary.

Moreover, a plaintiff need not prove the existence of a special duty if the municipality was acting in a proprietary capacity. Instead, if the court determines that the municipality was acting in such capacity, the municipality "is subject to suit under the ordinary rules of negligence applicable to nongovernmental parties" (*Wittorf v City of New York*, 23 NY3d 473, 479 [2014] [internal quotation marks omitted]; *see Miller*, 62 NY2d at 511).

As noted, there are certain categories of actions that have long been held to fall definitively within either the proprietary or the governmental end of the spectrum. For example, "[p]olice and fire protection are examples of long-recognized, quintessential governmental functions" (*Applewhite*, 21 NY3d at 425; *see World Trade Ctr.*, 17 NY3d at 448; *Miller*, 62 NY2d at 512). Highway planning, design, and maintenance, by contrast, are proprietary functions, arising from a municipality's "proprietary duty to keep its roads and highways in a reasonably safe condition" (*Wittorf*, 23 NY3d at 480). A municipality's proprietary duty to keep its roadways in a reasonably safe condition is well settled (*see Friedman v State of New York*, 67 NY2d 271, 283 [1986]; *see generally Riss v City of New York*, 22 NY2d 579, 581 [1968]; *Oeters v City of New York*, 270 NY 364, 368 [1936]).

In the specific proprietary field of roadway safety, a municipality is afforded "a qualified immunity from liability arising out of a highway planning decision" (*Friedman*, 67 NY2d at

283).[1] The qualified nature of the immunity is based on the principle that "[o]nce [a municipality] is made aware of a dangerous traffic condition it must undertake reasonable study thereof with an eye toward alleviating the danger" (*id.* at 284). The immunity arises only " 'where a duly authorized public planning body has entertained and passed on the *very same* question of risk as would ordinarily go to the jury' " (*Ernest v Red Cr. Cent. School Dist.*, 93 NY2d 664, 673 [1999], *rearg denied* 93 NY2d 1042 [1999], quoting *Weiss v Fote*, 7 NY2d 579, 588 [1960], *rearg denied* 8 NY2d 934 [1960]; *see Affleck v Buckley*, 96 NY2d 553, 557 [2001]). Even if the municipality conducts a traffic study, it "may be held liable when its study of a traffic condition is plainly inadequate or there is no reasonable basis for its traffic plan" (*Friedman*, 67 NY2d at 284). Furthermore, "after the State implements a traffic plan it is 'under a continuing duty to review its plan in the light of its actual operation' " (*id.*, quoting *Weiss*, 7 NY2d at 587). In addition, "an unjustifiable delay in implementing [a remedial] plan constitutes a breach of the municipality's duty to the public just as surely as if it had totally failed to study the known condition in the first instance" (*Friedman*, 67 NY2d at 286).

The City generally does not dispute that the maintenance of roadways in a safe condition falls within the proprietary category. Rather, the City contends that plaintiffs' claims actually arise from an alleged police failure to enforce the speed limit on Gerritsen Avenue. Inasmuch as police protection is a "quintessential governmental function[ ]" (*Applewhite*, 21 NY3d at 425), the City argues that plaintiffs were required to prove special duty, and that the City is immune from liability pursuant to the governmental function immunity defense.

We disagree. The City's contention is in conflict with the principle that "the determination of the primary capacity under which a governmental agency was acting turns *solely on the acts or omissions claimed to have caused the injury*" (*World Trade Ctr.*, 17 NY3d at 447 [emphasis added]). In their complaint and bill of particulars, and throughout the trial,

---

**1.** This qualified immunity, which applies in a specific field of proprietary functions, is separate from the governmental function immunity defense, which applies only to governmental functions, as explained. Moreover, "[t]here are many other types of immunity defenses that may be raised by governmental entities, including quasi-judicial immunity, legislative immunity and prosecutorial immunity" (*Valdez*, 18 NY3d at 76 n 2). We do not endeavor in this decision to address all defenses available to a municipality in a negligence action.

plaintiffs contended that Anthony's injuries arose from the City's failure to maintain Gerritsen Avenue in a reasonably safe condition. Specifically, plaintiffs alleged that the City negligently failed to conduct a traffic calming study on Gerritsen Avenue and failed to implement traffic calming measures that would have reduced speeding on that roadway. Plaintiffs did not allege that the City was negligent in failing to allocate adequate police resources to enforce the speed limit on Gerritsen Avenue.

To the contrary, part of plaintiffs' theory of the case was that although ICU referred the speeding problem to the police for enforcement, the problem was not, and could not be, alleviated solely through police enforcement. Plaintiffs' expert testified that police enforcement could be used to curb speeding, but that an adequate study of the speeding problem must be done, and that traffic calming measures were necessary if police enforcement was insufficient. The success of plaintiffs' theory therefore depended, in part, upon the jury's conclusion that the City had attempted to address the speeding problem through police enforcement, but that police enforcement was not successful in controlling speeding down the length of Gerritsen Avenue, and the City therefore had an obligation to use the traffic calming measures at its disposal to address the issue. Experts for both parties agreed that this is precisely the purpose of traffic calming—to deter speeding through roadway design changes.

We respectfully disagree with the dissent that the City was acting in a governmental capacity because plaintiffs claimed that the City failed to prevent unlawful behavior. It is not the characterization of the behavior sought to be prevented that determines whether the municipality was acting in a proprietary or governmental capacity, but rather the specific act or omission by the municipality claimed to have caused the injury (see World Trade Ctr., 17 NY3d at 447; Miller, 62 NY2d at 513). In Miller, for example, the Court held that the claimant's theory that the State "failed as a landlord to properly maintain the dormitory . . . by failing to lock the outer entrances" fell "within the scope of the State's proprietary function as a landlord," even though the behavior sought to be prevented by locking the outer doors was trespassing, robbery, burglary, and assault (see Miller, 62 NY2d at 509-514). Here, although the behavior sought to be prevented (speeding) was unlawful, plaintiffs presented evidence that roadway design changes in

the form of traffic calming measures were available to the City to accomplish that purpose.

Furthermore, *Tomassi v Town of Union* (46 NY2d 91 [1978]) does not require a contrary result. Although the Court stated in that case that the government has a duty to make its highways "reasonably safe for people who obey the rules of the road" (*id.* at 97),[2] that statement cannot be read to absolve a municipality of liability for failure to keep its roadways in a reasonably safe condition whenever a vehicle collision involves driver error, such as exceeding the speed limit. Otherwise, a plaintiff involved in a collision with a vehicle that was traveling 56 miles per hour in a 55 mile-per-hour zone would be required to prove the existence of a special duty when alleging that the government failed to maintain the roadway in a reasonably safe condition. The Court in *Tomassi* further explained that a municipality must "construct and maintain its highways in a reasonably safe condition, taking into account such factors as *the traffic conditions apprehended*, the terrain encountered, fiscal practicality and a host of other criteria" (*id.* [emphasis added]).

We do not suggest that a municipality has a proprietary duty to keep its roadways free from all unlawful or reckless driving behavior. Under the particular circumstances of this case, however, plaintiffs demonstrated that the City was made aware through repeated complaints of ongoing speeding along Gerritsen Avenue, that the City could have implemented roadway design changes in the form of traffic calming measures to deter speeding, and that the City failed to conduct a study of whether traffic calming measures were appropriate and therefore failed to implement any such measures. As discussed below, whether the City's negligence was a substantial factor in causing the accident or Pascarella's speeding was the sole proximate cause,

2. *Tomassi* involved the careless driving of two motorists whose vehicles collided on the roadway, after which one vehicle was forced into a drainage ditch on the side of the road (*see Tomassi*, 46 NY2d at 96). We have subsequently stated that "[i]mplicit in [the *Tomassi*] decision was that the municipality had no duty to improve and maintain the land abutting the roadway in a reasonably safe condition for passage by automobiles" (*Bottalico v State of New York*, 59 NY2d 302, 305 [1983]; *see Stiuso v City of New York*, 87 NY2d 889, 891 [1995]). Where, however, "the State or one of its governmental subdivisions undertakes to provide a paved strip or shoulder alongside a roadway, it must maintain the shoulder in a reasonably safe condition for foreseeable uses, *including its use resulting from a driver's negligence*" (*Bottalico*, 59 NY2d at 304 [emphasis added]).

and whether the City was entitled to qualified immunity based on its response to those repeated complaints, were both issues to be resolved by the jury.

██ We therefore conclude that the specific acts or omissions that plaintiffs claim caused the injury arose from the City's failure to keep Gerritsen Avenue in a reasonably safe condition. Specifically, the City failed to conduct an adequate study of whether to implement roadway design changes that would have controlled speeding. As such, the City was acting in a proprietary capacity. Plaintiffs had no obligation to prove special duty, and the City cannot rely on the governmental function immunity defense.

### III.

The City further contends that plaintiffs failed to meet their burden to demonstrate that its negligence was a proximate cause of the accident. Our review of that issue is limited to whether there is a " 'valid line of reasoning and permissible inferences which could possibly lead rational [persons] to the conclusion reached by the jury on the basis of the evidence presented at trial' " (*Mazella v Beals*, 27 NY3d 694, 705 [2016], quoting *Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]; *see Ziecker v Town of Orchard Park*, 75 NY2d 761, 762-763 [1989]). If "the evidence is such that it would not be utterly irrational for a jury to reach the result it has determined upon, and thus a valid question of fact does exist," then this Court "may not conclude that the verdict is as a matter of law not supported by the evidence" (*Cohen*, 45 NY2d at 499; *see Ziecker*, 75 NY2d at 762-763).

"[T]here may be more than one proximate cause of an injury" (*Argentina v Emery World Wide Delivery Corp.*, 93 NY2d 554, 560 n 2 [1999]; *see Mazella*, 27 NY3d at 706). "A defendant's negligence qualifies as a proximate cause where it is 'a substantial cause of the events which produced the injury' " (*Mazella*, 27 NY3d at 706, quoting *Derdiarian v Felix Contr. Corp.*, 51 NY2d 308, 315 [1980], *rearg denied* 52 NY2d 784, 829 [1980]). The plaintiff is not required to demonstrate "that the precise manner in which the accident happened, or the extent of injuries, was foreseeable" (*Derdiarian*, 51 NY2d at 315). "Given the unique nature of the inquiry in each case," proximate cause is generally an issue for the trier of fact, so long as "the court has been satisfied that a prima facie case has been established" and the evidence could support various

reasonable inferences (*id.*; *see generally Bell v Board of Educ. of City of N.Y.*, 90 NY2d 944, 946 [1997]; *Alexander v Eldred*, 63 NY2d 460, 468 [1984]).

The City contends that Pascarella's reckless and criminal speeding was the sole proximate cause of the accident. It is well settled, however, that "[w]here the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed. In such a case, liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence" (*Derdiarian*, 51 NY2d at 315). This is true even where the intervening acts of a third party may be characterized as intentional, reckless, or criminal. Although "an intervening intentional or criminal act will generally sever the liability of the original tort-feasor," this principle "has no application when the intentional or criminal intervention of a third party or parties is reasonably foreseeable" (*Kush v City of Buffalo*, 59 NY2d 26, 33 [1983]; *see Bell*, 90 NY2d at 946). As with determinations regarding proximate cause generally, "[b]ecause questions concerning what is foreseeable and what is normal may be the subject of varying inferences," whether an intervening act is foreseeable or extraordinary under the circumstances "generally [is] for the fact finder to resolve" (*Derdiarian*, 51 NY2d at 315).

Based on the evidence presented at trial, there was a valid line of reasoning and permissible inferences from which the jury could conclude that Pascarella's speeding down Gerritsen Avenue was a foreseeable consequence of the City's failure to implement traffic calming measures, the purpose of which is to modify driver behavior so as to deter drivers from speeding. In other words, Pascarella's speeding, although reckless and criminal, was "a 'reasonably foreseeable' consequence of circumstances created by the [City]" (*Bell*, 90 NY2d at 946, quoting *Kush*, 59 NY2d at 33). "An intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders the actor negligent" (*Derdiarian*, 51 NY2d at 316).

The City relatedly contends that plaintiffs failed to establish that any traffic calming measure would have prevented Pascarella from speeding. The City relies on the testimony of the experts for both parties, who agreed that traffic calming measures could not physically prevent a driver from speeding,

with the exception of speed bumps, which generally have fallen out of use due to safety concerns. Plaintiffs' expert testified, however, that it was known among traffic engineers that straight, wide roads with little interference from pedestrians and other vehicles, such as Gerritsen Avenue, encourage speeding because drivers feel more comfortable on roadways with those characteristics. He testified that traffic calming measures deter speeding because they cause drivers to be more cautious, and that such measures are known to reduce the overall speed on roadways. The evidence presented at trial, however, demonstrated that the City did not adopt any traffic calming measures because it did not study whether any such measures were required in the first instance. Plaintiffs' expert opined that it was this failure to conduct a traffic calming study that contributed both to the continued speeding on Gerritsen Avenue generally and to this particular accident. Even the City's expert agreed that the design characteristics of a roadway influence driver speed, and that people generally drive faster on wide, straight roadways, regardless of the posted speed limit. The City's expert further agreed that traffic calming measures are intended to reduce the overall "curve" of speed on a particular roadway by modifying driver behavior so that drivers will travel at or closer to the prescribed speed limit.

We therefore hold that plaintiffs presented a prima facie case that the City was aware of a dangerous condition on Gerritsen Avenue and failed to take appropriate action to study or remedy it, and that the City's negligence was a proximate cause of Anthony's injuries (*see Ernest*, 93 NY2d at 674-675). There was a rational process by which the jury could have concluded that traffic calming measures deter drivers such as Pascarella from speeding, and that the City's failure to conduct a traffic calming study and to implement traffic calming measures was a substantial factor in causing the accident (*cf. Nallan v Helmsley-Spear, Inc.*, 50 NY2d 507, 520-521 [1980]). Where, as here, various reasonable inferences could be drawn from the evidence presented, the determination of proximate cause must be left to the jury, and "[i]t is not within the province of this [C]ourt to substitute its assessment of the evidence for that of the fact finder" (*Alexander*, 63 NY2d at 468; *see Derdiarian*, 51 NY2d at 315). We cannot conclude, as a matter of law, that Pascarella's speeding was an unforeseeable result of the City's negligence (*see Bell*, 90 NY2d at 946-947; *Kush*, 59 NY2d at 33), or that the jury's verdict with respect to causation was "utterly irrational" (*Cohen*, 45 NY2d at 499).

## IV.

Finally, the City contends that, even if it was acting in a proprietary capacity, it was entitled to immunity for its discretionary highway planning and design decisions pursuant to the qualified immunity doctrine this Court recognized in *Weiss v Fote*. The City is correct that "when a municipality studies a dangerous condition and determines as part of a reasonable plan of governmental services that certain steps need not be taken, that decision may not form the basis of liability" (*Friedman*, 67 NY2d at 286). As explained above, however, we have also stated that this qualified immunity applies only " 'where a duly authorized public planning body has entertained and passed on the *very same* question of risk as would ordinarily go to the jury' " (*Ernest*, 93 NY2d at 673, quoting *Weiss*, 7 NY2d at 588). The municipality may be held liable if "its study of a traffic condition is plainly inadequate" or if the municipality fails to fulfill its "continuing duty to review its plan in the light of its actual operation" (*Friedman*, 67 NY2d at 284 [internal quotation marks omitted]).

During trial, plaintiffs presented evidence that the primary purpose of the ICU studies was to determine whether traffic control signals should be installed at particular intersections, and although ICU also studied the approach speed at the subject intersection in three of the four studies, the ICU studies did not study the problem of drivers speeding down the length of Gerritsen Avenue and were not traffic calming studies. Testimony from current and former City employees who worked in various positions within DOT demonstrated that ICU does not conduct traffic calming studies, and that such studies were customarily conducted by the Planning Unit of DOT. The evidence presented at trial established that no traffic calming study was conducted on Gerritsen Avenue before Anthony's accident.

Plaintiffs' expert opined that an appropriate study examining the problem of speeding down the length of Gerritsen Avenue would have included speed measurements taken at night and on weekends at various locations along the roadway for some length of time, and that the ICU studies, which measured approach speed at particular intersections during weekdays for approximately 20 minutes, did not meet those criteria. Plaintiffs' expert also testified that laypeople often ask for traffic control signals to deter speeding but that it was well known among traffic experts that traffic signals do not control

speed and could exacerbate the problem. The current and former DOT employees who testified at trial, as well as the City's expert, agreed that traffic signals generally are not used to control speed and may aggravate the existing speeding problem.

Based on the evidence presented at trial, there was a rational process by which the jury could conclude that the ICU studies—which were intended primarily to determine whether traffic control signals were appropriate for particular intersections on Gerritsen Avenue—did not study the "very same" question of risk that was before the jury, i.e., the danger presented by vehicles speeding down the length of Gerritsen Avenue (*see Ernest*, 93 NY2d at 673-674; *cf. Affleck*, 96 NY2d at 556-557). In other words, the jury could have reasonably concluded that the ICU studies were "plainly inadequate" (*Friedman*, 67 NY2d at 284) because they did not examine the speeding problem of which various local residents and elected officials complained. To the extent that the City's witnesses testified that the ICU studies contained "elements" of traffic calming studies, and that the ICU studies were adequate to address the problem of speeding vehicles on Gerritsen Avenue, that evidence presented questions of fact and competing inferences for the jury to resolve.

▇ Furthermore, there was a rational process by which the jury could have concluded that even if the ICU studies examined the problem of vehicles speeding along a stretch of Gerritsen Avenue, the City failed to fulfill its " 'continuing duty to review its plan in the light of its actual operation' " (*Friedman*, 67 NY2d at 284, quoting *Weiss*, 7 NY2d at 587). The City's expert opined that the ICU studies and ICU's referral of the speeding problem to police for enforcement was an adequate response to the issue. Plaintiffs' expert opined, however, that the City failed to determine whether police enforcement of the speed limit was sufficient to control speeding, and, if it was not, whether traffic calming measures should be implemented. DOT's Chief of Signals, to whom ICU reported, testified that after ICU referred the speeding problem for police enforcement, ICU would not follow up to determine whether the police enforcement was working unless it received another request for a traffic control device at a particular intersection, and then only after 18 months had elapsed from its last study at that intersection. Under these circumstances, we cannot conclude as a matter of law that the City was entitled to qualified immunity.

## V.

In summary, the City was acting in a proprietary capacity. The specific act or omission by the City claimed to have caused Anthony's injuries was the City's failure to adequately study or implement roadway design changes intended to reduce speeding in response to repeated complaints. Plaintiffs had no obligation to prove special duty, and the City may not rely on the governmental function immunity defense. In addition, there was a rational process by which the jury could conclude that Pascarella's speeding was a foreseeable consequence of the City's failure to study or implement traffic calming measures, the purpose of which is to deter speeding. Finally, the jury could have rationally concluded that the four ICU studies did not examine the very same question of risk presented to the jury—the danger of vehicles speeding along the length of Gerritsen Avenue—and that the ICU studies were inadequate to address that problem. Therefore, it was reasonable for the jury to conclude that the City was not entitled to qualified immunity.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs.

PIGOTT, J. (dissenting). A 12-year-old child rode his bicycle across a four-lane highway at night. A car traveling at nearly twice the speed limit struck the child, causing severe injuries. Although the driver of the automobile eventually pleaded guilty to a felony charge of reckless assault, a jury determined—in a verdict affirmed by the majority on this appeal—that the City of New York was liable for the accident. Why? Because the City failed to take adequate measures to prevent the speeding motorist from breaking the law. That result is antithetical to our case law and principles of government immunity. How the City chooses to combat criminal conduct such as speeding on public roadways is a discretionary, governmental function, absolutely immune from suit. The majority's contrary decision exposes governmental entities to tort liability whenever they fail to take measures that could, conceivably, prevent a crime from taking place. I dissent and would reverse the judgment below.

## I.

The majority correctly states the governing principles surrounding municipal liability. Those principles derive from the

fundamental rule that the State and its political subdivisions are generally immune from suit "for discretionary actions taken during the performance of governmental functions" (*Valdez v City of New York*, 18 NY3d 69, 75-76 [2011]). Such acts are immune from liability because they involve the allocation of limited public resources for the protection and safety of the public at large—determinations that are better left to the discretion of the executive and legislative branches of government than to courts or a jury (*cf. Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d 428, 452-453 [2011]). Immunizing such decisions from tort liability also reflects a value judgment: that "the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for . . . injury" (*Haddock v City of New York*, 75 NY2d 478, 484 [1990]).

When a municipality is not undertaking a traditional government function but has assumed the role of a private individual, it is said to be acting in a "proprietary capacity" and may be subject to the same principles of tort law as private citizens (*see Wittorf v City of New York*, 23 NY3d 473, 479 [2014]). Indeed, "[i]t is proper and necessary to hold municipalities and the State liable for injuries arising out of the day-by-day operations of government—for instance, the garden variety injury resulting from the negligent maintenance of a highway" (*Weiss v Fote*, 7 NY2d 579, 585 [1960]).

To determine whether the government is immune from liability in a given case, we examine "the specific act or omission out of which the injury is claimed to have arisen" (*Wittorf*, 23 NY3d at 479, quoting *Miller v State of New York*, 62 NY2d 506, 513 [1984]). If the particular negligence claimed arises from an act or omission by the government in its proprietary role as a landowner or landlord, it will be "subject to suit under the ordinary rules of negligence applicable to nongovernmental parties" (*Applewhite v Accuhealth, Inc.*, 21 NY3d 420, 425 [2013]). But if the specific act or omission claimed to be the cause of the accident involves the government's traditional role as the provider of public resources to protect the populace at large—and *"particularly to control the activities of criminal wrongdoers"* (*Riss v City of New York*, 22 NY2d 579, 581 [1968] [emphasis added])—the government is entitled to absolute immunity and cannot be held liable for negligence unless it owed

a special duty to the injured party (*Applewhite*, 21 NY3d at 425-426).[1]

I do not disagree with the majority that the government, acting as a landowner, has a proprietary duty to maintain roadways in a reasonably safe condition (*see* majority op at 479). That duty requires the government, among other things, to install adequate traffic control signals (*see Alexander v Eldred*, 63 NY2d 460, 469 [1984]; *Weiss*, 7 NY2d at 586), erect and maintain proper barriers (*see Gomez v New York State Thruway Auth.*, 73 NY2d 724, 725 [1988]; *Friedman v State of New York*, 67 NY2d 271, 286-287 [1986]), provide adequate warnings of unsafe road conditions (*see Hicks v State of New York*, 4 NY2d 1, 4 [1958]), remove dangerous snowbanks (*see Gardner v State of New York*, 79 AD3d 1635, 1636 [4th Dept 2010]), remove standing water (*see Kelly v Town of Islip*, 141 AD2d 611, 612 [2d Dept 1988], *lv dismissed and denied* 73 NY2d 865 [1989]), fill potholes (*see Ciccarella v Graf*, 116 AD2d 615, 616 [2d Dept 1986]), and generally clear roadways of debris and other hazards (*see Green v State of New York*, 71 AD2d 761, 761 [3d Dept 1979]). When the government is aware that these or similar conditions exist on a roadway yet fails to remedy the situation or study it with an eye toward alleviating the danger, the government may be subject to liability for injuries that result (*see Friedman*, 67 NY2d at 284).

The proprietary duty to maintain safe roadways, however, extends no further than making the road safe *for individuals who follow the rules of the road* (*see Tomassi v Town of Union*, 46 NY2d 91, 97 [1978]; *see also Duger v Estate of Carey*, 295 AD2d 878, 878-879 [3d Dept 2002]). It does not encompass a municipality's efforts to deter or prevent unlawful activity such as speeding. Thus, in *Tomassi v Union*, we rebuffed an attempt by plaintiffs in an automobile accident to cast the government's alleged negligence—placing a storm-water drainage ditch too close to the roadway—as a breach of its proprietary duty to maintain reasonably safe roads when, in reality, their injuries were caused by the unlawful activity of two drivers (46 NY2d at 96).

The plaintiffs in that case were passengers in a vehicle that was traveling down a two-lane road in Broome County at "an

---

**1.** Plaintiffs make no claim that the City owed them a special duty in this case. The City is therefore immune from suit if it was engaged in a governmental function.

excessive rate of speed" (*id.*). Their car was struck by another vehicle, traveling the opposite direction, whose driver was "not paying careful attention" and veered into the plaintiffs' lane of traffic (*id.*). The passengers sustained injuries when their vehicle went off the road into a shallow storm-water drainage ditch. They brought a lawsuit against both drivers as well as the Town of Union for negligence, alleging, as relevant here, that the town negligently constructed the drainage ditch too close to the roadway and that its proximity to the road caused their injuries.

The jury returned a verdict in favor of the plaintiffs, but we reversed it on appeal, holding that "there are no grounds upon which the liability of the town may be properly predicated" (*id.* at 97). Although the government has a proprietary obligation to maintain roadways in a reasonably safe condition, we said that duty requires only that the government make the road "reasonably safe *for people who obey the rules of the road*" (*id.* [emphasis added]). Because there was no allegation that the road was unsafe for law-abiding motorists, the town could not be held liable for failing to reduce or prevent injuries that resulted from unlawful activity.

Our decision in *Tomassi* isn't unique to roadway maintenance and design. We have repeatedly held, in other contexts, that a governmental entity is immune from suit where the crux of the plaintiffs' complaint is that the government failed to take measures that could have prevented criminal activity. For example, the plaintiff in *Weiner v Metropolitan Transp. Auth.* (55 NY2d 175 [1982]) was assaulted by an intruder in a subway station owned and maintained by the defendant New York City Transit Authority. Because the government was engaged in the proprietary operation of a commuter railroad, the plaintiff alleged it was liable for failing to provide adequate police protection at the train station that it operated.

We disagreed. The specific omission alleged to be negligent was not the failure to maintain the premises in a reasonably safe condition but "the absence of police surveillance at the entrance [of the subway station] and the failure to warn of criminal activity in the area or close the entrance when police protection was not available" (*id.* at 182). Such claims are not actionable absent a special duty, we held, because it would require juries and courts to second-guess discretionary decisions about how to utilize public resources to provide general police protection and security for the public—determinations better left to the legislative and executive branches (*id.*).

The plaintiff in *Bonner v City of New York* (73 NY2d 930 [1989]) tried a similar tactic as the plaintiff in *Weiner*, again to no avail. He was a public school teacher assigned to supervise the playground at a city school in Manhattan. Because one of the gates surrounding the playground had a broken lock, the plaintiff posted himself at the gate for the security of the school children. A person who did not attend the school approached him and hit him with a baseball bat. The plaintiff brought a personal injury action against the City of New York and school district, alleging, among other things, that they "were negligent in allowing the gate to remain broken" (*id.* at 932). The jury returned a verdict against the City and school district, and the Appellate Division affirmed.

We reversed the verdict on appeal, holding that the trial court erroneously submitted the matter to the jury (*id.*). As in *Weiner*, we looked beyond the plaintiff's characterization of his claim to the heart of the allegations. We concluded that "the particular negligence alleged [wa]s not the failure to fulfill a proprietary function," such as repairing the broken lock. Instead, plaintiff's claim was "premised on the contention that defendant's security system . . . was *inadequate to protect him from criminal activity*" (*id.* at 932 [emphasis added]). Because the City's efforts to guard against criminal attacks involve policy decisions, "no liability arises from the performance of such a function absent a special duty of protection" (*id.* at 932).[2]

In *Clinger v New York City Tr. Auth.* (85 NY2d 957 [1995]), we rejected yet another plaintiff's attempt to cast a municipality's purported negligence as proprietary, when the gravamen of

---

**2.** The majority relies on *Miller v State of New York* (62 NY2d 506 [1984]) for the proposition that the City's duty to maintain property in a reasonably safe condition requires it to implement traffic calming measures to prevent unlawful activity such as speeding (*see* majority op at 481-482). But *Bonner* was decided after *Miller* and has been suggested to "cast serious doubt on [*Miller*'s] continuing validity" (73 NY2d at 933 [Simons, J., dissenting]). Moreover, *Miller* cannot be read as broadly as the majority suggests. The narrow duty the State breached in *Miller* was the duty "to maintain minimal security measures" at State-owned dormitories (62 NY2d at 513). The State did not breach that duty by failing to keep a particular dormitory door locked at a given time, but by implementing a *policy* of keeping all entrances at all State University of New York dormitories unlocked at all times (*id.* at 514 [Kaye, J., concurring]). We held that even a private individual would be held liable for failing to "furnish *any* security to [its] tenants" (*id.*). The particular facts in *Miller* thus put the State's conduct on the proprietary end of the spectrum. That case does not stand for the general rule that the government has a proprietary duty to take measures to prevent unlawful activity.

the complaint was that the City of New York failed to prevent a criminal attack from taking place inside a subway tunnel. The plaintiff in *Clinger* had been attacked in a subway tunnel that was under construction. The assailant dragged her behind a large metal plate that had been temporarily positioned against the tunnel wall during construction, and he proceeded to beat, rape and rob her there (*id.* at 959). Like her predecessors in *Weiner* and *Bonner*, the plaintiff in *Clinger* claimed that the City's negligent placement of the large metal plate and its failure to close the tunnel or properly police it breached the City's proprietary duty to maintain the subway tunnel in good repair. We rejected that claim and held that the City could not be liable in tort. The real omission at issue—the City's failure to take adequate measures to prevent criminal activity in an area that it *knew* "had been the site of numerous violent felonies in the year preceding th[e] attack"—was "*so overwhelmingly governmental in nature*" as to immunize the City from liability (*id.* [emphasis added]).

It's unclear to me how the majority could reach any other conclusion in this case. It has long been the rule in this state that the government's efforts "*to control the activities of criminal wrongdoers*" belong in the category of discretionary, governmental functions immune from suit (*Riss*, 22 NY2d at 581 [emphasis added]). The particular negligence alleged in this case is that the City failed to conduct a traffic calming study on Gerritsen Avenue in response to complaints of speeding—in short, that the City did not adequately respond to criminal activity or take the appropriate measures to prevent it. That kind of allegation goes well beyond the City's proprietary duty to maintain safe roadways. It seeks to impose liability on the City for its discretionary efforts to deter individuals from deliberately breaking the law, when we have previously rejected such claims (*see Clinger*, 85 NY2d at 959 [municipal defendant not liable for injuries sustained on its property as a result of criminal activity, even though the City had a duty to maintain property in a reasonably safe condition and easily could have prevented the crime by closing access to the subway tunnel it knew had been the site of numerous attacks]; *Bonner*, 73 NY2d at 932 [municipal defendants not liable for injuries suffered at the hands of criminals, even though they had a proprietary duty to maintain property in a reasonably safe condition and easily could have prevented the crime by replacing a broken lock]).

Whether the majority characterizes the City's alleged negligence as a failure to undertake appropriate traffic calming studies or a failure to respond adequately to complaints of speeding, at bottom, the plaintiffs' complaint is that the City didn't do enough to prevent drivers like Louis Pascarella from engaging in criminally reckless conduct on Gerritsen Avenue.[3] If there is anything to be learned from our case law in this area, it is that a municipality's efforts to respond to criminal activity are "so overwhelmingly governmental in nature," they cannot expose the municipality to liability in tort (*Clinger*, 85 NY2d at 959). If they did—and after the majority's decision today they most certainly will—then municipalities throughout the state will be haled into court whenever a plaintiff who has been injured on the road at the hands of a speeding or intoxicated motorist is able to identify alternative measures the government could have taken to attempt to prevent the accident.[4]

To be sure, the issue in this case is not whether the City *should* have conducted a traffic calming study or undertaken any other measures to reduce criminal activity on Gerritsen Avenue. The question is whether the City may be held liable in a personal injury action when it chooses not to utilize one or more of the methods that plaintiffs contend would have prevented the criminally reckless conduct that ultimately

---

**3.** The majority characterizes Pascarella's felonious conduct as mere "driver error," equating it to simple negligence (*see* majority op at 482). In reality, he pleaded guilty to second-degree assault for recklessly causing injury with a dangerous instrument (*see* Penal Law § 120.05 [4]), and he had engaged in such conduct on Gerritsen Avenue on numerous occasions throughout his adult life. The City was precluded at trial from introducing evidence that Pascarella's driver's license had been suspended 18 times, that he had previously been convicted of driving under the influence, and that he had received numerous moving violations for speeding, including one for speeding on Gerritsen Avenue.

**4.** The majority is attempting to fit a square peg (unlawful activity) into a round hole (highway planning and design). It holds that anytime a municipality is aware that criminally reckless behavior is taking place on the roadway and police enforcement is not adequate to deter such behavior, the municipality *must* use available methods of highway planning and design to curb the criminal activity or else defend a suit for negligence if an accident results (*see* majority op at 481). Not only does the majority's conclusion conflate two, analytically distinct duties, but it also imposes an insurmountable burden on the government. By the majority's logic, a municipality will be subject to suit anytime it fails to take one or more available measures that could, conceivably, prevent a crime.

caused their injuries. I would answer that question "no" and reverse the judgment below.

## II.

Because the City was engaged in a governmental function when it chose to refer complaints of speeding on Gerritsen Avenue for greater police enforcement rather than conduct a traffic calming study, and because plaintiffs did not attempt to prove that the City owed them a special duty, the City was absolutely immune from suit. Even assuming, however, that the City owed a duty to investigate potential traffic calming measures and that its investigation was inadequate, plaintiffs failed as a matter of law to establish that the City's alleged negligence was a proximate cause of the injuries sustained.

If a municipality is not entitled to immunity, a plaintiff still must demonstrate that its negligent maintenance of the roadway was a proximate cause of the accident (*see Atkinson v County of Oneida*, 59 NY2d 840, 841 [1983]). Where the evidence reveals that the municipality's failure to remedy a dangerous condition would have "had no bearing on the happening of the accident," liability does not lie (*Hicks*, 4 NY2d at 7-8 [finding no basis in the record for assuming that the State's failure to erect a stop sign at an intersection proximately caused an accident where the driver "paid no attention to the physical indications that she was approaching an intersection" and "disregarded" guideposts lining the shoulders of the road]; *see also Kent v State of New York*, 37 AD2d 119, 121 [3d Dept 1971] [the State's failure to warn drivers of road construction did not proximately cause accident where additional warnings would not have caused intoxicated driver to operate his car differently]).

So, too, where the driver of an automobile that has caused an accident is familiar with a particular roadway and a dangerous condition that exists on it, the municipality's failure to take additional measures to warn the driver of the obstruction cannot be deemed a proximate cause of the plaintiff's injuries (*Atkinson*, 59 NY2d at 842). "A municipality, of course, is not an insurer of the safety of its roadways," and a City's failure to take every step to eliminate tragic accidents does not mean the City's acts or omissions proximately caused the plaintiff's injuries (*Tomassi*, 46 NY2d at 97).

The accident at issue in this case was caused by the unlawful actions of the plaintiff—who crossed four lanes of traffic

at night—and Louis Pascarella—who chose to drive almost 30 miles over the speed limit with a suspended license, as he had done on numerous occasions. Indeed, Pascarella ultimately pleaded guilty to criminally reckless assault for consciously disregarding a substantial and unjustifiable risk of injury to another (*see* Penal Law §§ 15.05 [3]; 120.05 [4]), undercutting the plaintiffs' argument that a traffic calming study could have had some bearing on the happening of the accident. What is more, plaintiffs' expert admitted that no traffic calming measure would prevent drivers like Pascarella from deliberately breaking the law. By the expert's own words: "You're not going to stop a person who wants to speed."

Given that testimony and the absence of any evidence that particular traffic calming measures would have prevented Pascarella's recklessness, there is no rational basis upon which the jury could have concluded that the City's failure to undertake a traffic calming study was a "substantial cause of the events which produced the injury" (*Mazella v Beals*, 27 NY3d 694, 706 [2016] [internal quotation marks omitted]). Accordingly, whether the City is immune from liability based on discretionary decisions it made in its governmental function, or plaintiffs failed to establish that the City's inaction was the proximate cause of their injuries, the City is not liable for the tragic accident that occurred on Gerritsen Avenue.

Chief Judge DiFiore and Judges Rivera, Abdus-Salaam, Stein and Garcia concur; Judge Pigott dissents in an opinion.

Order, insofar as appealed from, affirmed, with costs.