THELMA CROSLAND, Individually and as Administratrix of the Estate of STEVEN CROSLAND, JR., Deceased, Respondent, v NEW YORK CITY TRANSIT AUTHORITY, Appellant, et al.; Defendants.

Second Department, September 9, 1985

**APPEARANCES OF COUNSEL**

*William E. Rosa* (*Lawrence Heisler* of counsel), for appellant.

*Jerome Seidel* (*Daniel R. Seidel* of counsel), for respondent.

**OPINION OF THE COURT**

MOLLEN, P. J.

On this appeal, we are called upon to determine whether, in a wrongful death action, the defendant New York City Transit Authority may be cast in damages arising from an assault on a passenger by members of a local youth gang. We begin with a review of the facts.

Between 8:00 and 11:00 P.M., on March 12, 1982, Steven Crosland, Jr. (Steven), attended a concert at the High School of Music and Art (Music and Art). At the conclusion of the concert, Steven and several classmates walked to the nearby IND subway station at 135th Street in Manhattan. They took the local train one stop to 125th Street and waited for the express. While waiting, Steven and some of his classmates were assaulted by members of a youth gang, who were armed with bats,

tire irons, chains and other weapons. Steven died some 12 days later as a consequence of the injuries he received during the assault.

Plaintiff commenced this action, *inter alia,* against the defendant New York City Transit Authority (Transit Authority) in essence alleging three separate theories of recovery. First, it was alleged that the Transit Authority breached its special duty of care to Steven because it failed to maintain "around-the-clock police presence" at the 125th Street subway station, notwithstanding that it was on notice that members of local youth gangs had previously attacked Music and Art students. Second, it was alleged that the Transit Authority's employees breached a duty to Steven by failing to "take every precaution to prevent * * * injuries to persons", in violation of the Transit Authority's rules and regulations, specifically rule 85. Third, the Transit Authority failed to meet the standard of care owed by common carriers to their passengers.[*]

According to the plaintiff, Music and Art students had been harassed by neighborhood youth gangs on several occasions prior to March 12, 1982, and the New York Police Department, as well as school officials of Music and Art, was aware of this harassment. Indeed, on the night in question, minor incidents occurred involving gang members and students attending the concert.

Plaintiff alleged that because of "the inordinately high rate of serious crimes committed in the area of, and including the 125th Street station of the IND line", the defendant Transit Authority and/or the New York City Police Department "assigned police-people [*sic*], uniformed and/or otherwise, for shifts around-the-clock, i.e., twenty-four hours daily". However, when the incident in question occurred, the transit police, who were then assigned to the 125th Street station, "willfully, wantonly and negligently breached their duties and abandoned their posts and/or failed to appear at their posts at and/or during the [4:00 P.M. to midnight shift]".

In addition, plaintiff alleged that "there were no token booth clerks and/or railroad clerks in their assigned booths at the 125th Street station of the IND subway line" at the time in question. Plaintiff further alleged that having abandoned their posts and/or stations "said token booth clerks and/or railroad clerks [thereby] breached their duties and responsibilities".

---

[*] Also named as defendants were the City of New York, Board of Education of the City of New York, and the Police Department of the City of New York. Special Term granted their cross motions for summary judgment and, accordingly, they are no longer parties to this action.

Plaintiff also alleged that during the time in question there were several Transit Authority employees who were working on the tracks at the 125th Street station. According to plaintiff, the employees "had full and/or partial view of the * * * subway platform and its appurtenances during the time of the violence and attacks herein alleged". Nevertheless, the employees "ignor[ed] * * * permitt[ed] and encourag[ed] the * * * attack and violence * * * against [Steven]", thereby contravening the Transit Authority's rules and regulations.

In a similar vein, plaintiff alleged that two express trains "entered, stopped at and departed from the 125th Street station" during the period of time the attack occurred. The motormen and other members of the express train crews were believed to have been "able to see and to observe the platforms and appurtenances as the trains entered, stopped at and departed from" the station. These Transit Authority employees, too, were alleged to have "ignor[ed] and * * * permitt[ed] and encourag[ed] the hereinbefore described attacks and violence being perpetrated against [Steven]" which was in contravention of Transit Authority rules and regulations.

The Transit Authority moved for summary judgment pursuant to CPLR 3212, on the ground that "[b]ecause [it] owed decedent no duty to protect him from the criminal attack that lead [sic] to his death, it follows that this lawsuit must be dismissed".

In response to the motion, plaintiff argued, inter alia, that: "There is also a questions [sic] of fact as to what the token booth clerk saw and did he/she try to stop the thugs from descending onto the platform from the area which was in plain view of the token booth. It is alleged by Plaintiff that this gap in time (from the attack until the reported time) was a factor in [Steven's] sustaining his injuries. Even if the token clerk did nothing to stop the thugs who held their weapons in plain view, the clerk should have called, and was under an affirmative duty to call, for assistance. This is an issue of fact which should be heard by the Jury in determining the Defendants' negligence and proximate cause of [Steven's] injuries."

Plaintiff submitted affidavits from three students, who were present during the incident, to support this contention. Raol Pitts alleged that during the attack, "no clerk [was] visible in the token booth near us. There was a clerk present in the far-off booth at the 127th Street end of the station". Pitts fled from the scene in the direction of that token booth. As he approached it, he "screamed at [the man in that token booth] that we were

being attacked and he merely kept on counting his change and tokens and ignored me. He did not lift up his phone to call the Police".

Celeste Freedland alleged that after the attack began she "noticed that the token seller in the booth, whom [she] thought could call the cops, was not there or there did not appear to be anyone there from eye level. The booth was empty".

Anthony Crosland (Steven's brother) alleged that "[b]efore I left the station [after the attack began] I noticed that the token booth was directly opposite the exit gate on the upper level of the station which I think they call the mezzanine. I saw [sic] Transit Authority employee in the booth when I was trying to get out of the 125th Street Subway Station".

Finally, plaintiff alleged that, on the date in question, token booth clerks were scheduled "to be present in their token booths at the 125th Street station of the IND line, during the hours between 11 P.M. * * * and 1 A.M." and that the attack began at or about 11:40 P.M.

The Transit Authority replied that, contrary to these allegations of inaction or nonpresence, "the token booth clerk promptly signaled for help as soon as she was aware that something was amiss". A report prepared by a token booth operator, who was on duty at the 125th Street subway station at the time in question, was submitted in support of this contention.

Special Term denied the Transit Authority's motion, finding that a special relationship did indeed exist between the defendant Transit Authority and Steven, because transit police were specifically assigned to a particular station, which was "known for its high and violent crime rate, and it is the alleged abandoning of those police posts which may have set into motion a series of events which ultimately resulted in the death of Steven Crossland [sic], Jr." Special Term also found that the students could reasonably rely on a police presence to prevent the very incident which occurred on March 12, 1982. The court concluded that, "It is that reliance upon the special relationship, the deterrent effect which police presence creates, which may have given the students a false sense of security at the 125th Station [sic] at or about [the time in question]. It is the breach of the special relationship which encouraged hoodlums to attack the students, including Steven Crossland [sic], Jr. There is a question of fact as to when the Police Officers left their posts at the 125th Street Station platform, *not so much for the fact that under*

*then existing procedure, they were to leave before the arrival of their relief, but that they may in fact have left prematurely."*

We conclude that summary judgment as to the Transit Authority was properly denied, but for reasons different than those stated by Special Term.

In *Weiner v Metropolitan Transp. Auth.* (55 NY2d 175, 178-179), the Court of Appeals held: "The New York City Transit Authority owes no duty to protect a person on its premises from assault by a third person, absent facts establishing a special relationship between the authority and the person assaulted. That a nongovernmental common carrier would be liable under the same factual circumstances is not determinative of the authority's liability. Its immunity from such liability rests upon the same considerations as does the immunity of a municipality or other governmental body from liability for failure to provide adequate police protection, for the duty if one were recognized would necessarily implicate the Transit Authority police." Expressly rejected was the plaintiff's argument that because "the Transit Authority is engaged in a proprietary function [it is] subject to the same liability to protect its passengers from assault as is any common carrier * * * or as is the owner of real property who is aware of criminal acts that have occurred on his premises" (*Weiner v Metropolitan Transp. Auth., supra,* at p 180).

The *Weiner* court explained (p 182) that when the liability of a governmental entity is at issue, "[i]t is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs liability, not whether the agency involved is engaged generally in proprietary activity or is in control of the location in which the injury occurred".

In short, there can be no liability for negligence stemming from the performance of a governmental function, including police protection, "unless the injured person establishes *a special relationship* with the [governmental] entity, which would create a specific duty to protect that individual, and the individual relied on the performance of that duty" (*Miller v State of New York,* 62 NY2d 506, 510; emphasis supplied). A "special relationship" has been found in cases where, for example, the injured person received affirmative personal assurances of help from the police (*De Long v County of Erie,* 60 NY2d 296; *cf. Bardavid v New York City Tr. Auth.,* 61 NY2d 986), the injured person had collaborated with the police in the arrest and prosecution of a criminal (*see, Schuster v City of New York,* 5 NY2d

75), or the injured person — a minor — was a member of a "special class of persons" for whom the police assumed the limited duty of supervising school crossings (*see, Florence v Goldberg,* 44 NY2d 189, 196). Recently, in *Sorichetti v City of New York* (65 NY2d 461), the Court of Appeals concluded that a "special relationship" existed between an infant and her mother, and the municipality, because of (1) the issuance of a judicial order of protection directing the infant's father to refrain from threatening or assaulting his (the father's) wife, which order provided that it constituted authority for a peace officer to arrest a person charged with violating the order's terms; (2) the police department's knowledge of the father's history of assaultive and abusive conduct toward his family and his immediate threats of harm to his infant daughter; and (3) the police department's response to the mother's (wife's) pleas for assistance. A key element in these extraordinary cases in which a special relationship has been found to exist "is some direct contact between agents of the municipality and the injured party" (*Sorichetti v City of New York, supra,* at p 469).

A special relationship is not created when police protection is provided to the public because of the incidence of crime at a particular location (*see, Bardavid v New York City Tr. Auth., supra; Bass v City of New York,* 38 AD2d 407, *affd* 32 NY2d 894). Nor is a special relationship created because a person is in danger of becoming a victim of a crime, notwithstanding that the danger is real or imminent (*see, Satiro v City of New Rochelle,* 102 AD2d 821, *affd* 64 NY2d 614; *Dutton v City of Olean,* 60 AD2d 335, *affd* 47 NY2d 756).

In the case at bar, plaintiff's contention that the Transit Authority affirmatively assumed the duty to protect Music and Art students, including Steven, thereby establishing a special relationship with him either individually or as a member of that class, is based on a letter written by then Police Commissioner Robert J. McGuire some two months after Steven's death. In that letter, the Police Commissioner, *inter alia,* stated: "The 125th Street station is normally covered around the clock by two transit police officers. These officers are based at the 155th Street station. Transit police procedures require that the officers working the 4 p.m. to 12 midnight tour leave their post in time to return to their base before midnight in order to prevent overtime costs. The officers on the midnight to 8 a.m. tour usually arrive at 125th Street a few minutes after 12 midnight. This results in a ten to twenty minute period in which the station is not covered." As a consequence of the incident at the 125th Street station, deployment procedures pertaining to tran-

sit police officers assigned to that station were changed in an effort to reduce the possibility that similar incidents would occur in the future.

Absent from the record is any evidence that personal assurances of protection were made to Steven, his classmates, or their parents. Nor is there any evidence that the Transit Authority assumed the limited duty of protecting Music and Art students at the 125th Street station. All that appears in the record is that police protection was provided to the general public at a high crime location, which protection, standing alone, does not create a special relationship, nor does the alleged failure to maintain that protection amount to a breach of the standard of care required of common carriers (*see, Weiner v Metropolitan Transp. Auth., supra; Sorichetti v City of New York, supra; Bass v City of New York, supra*).

However, a governmental entity, when functioning in its proprietary, rather than governmental, capacity may be cast in damages for an injury or injuries arising from that entity's negligence (*see, Miller v State of New York,* 62 NY2d 506, *supra*). In *Miller,* the claimant, a student at the State University of New York at Stony Brook, was raped in her dormitory room by a man wielding a large butcher knife. As a consequence, she sued the State for damages, asserting in essence two theories of liability for negligence. First, the State was negligent in that it failed to provide adequate police protection. Second, the State, acting in a proprietary capacity as a landlord, breached its duty to protect its tenants, i.e., the dormitory residents, from reasonably foreseeable criminal assaults by outsiders.

Agreeing that liability could be premised on the second theory, the Court of Appeals held: "When the State operates housing, it is held to the same duty as private landlords in the maintenance of physical security devices in the building itself. Thus, a student who is injured in a criminal assault in a State-operated college dormitory may recover damages against the State in its capacity as a landlord upon a showing that there was a reasonably foreseeable likelihood of criminal intrusion into the building, that the State negligently failed to keep the outer doors locked, and that the failure was a proximate cause of the injury" (*Miller v State of New York, supra,* at pp 508-509).

In reaching this determination, the court did not retreat from its prior cases, including *Weiner v Metropolitan Transp. Auth.* (55 NY2d 175, *supra*), holding that in the absence of a "special relationship", and reliance thereon, "[p]ublic entities remain immune from negligence claims arising out of the performance

of their governmental functions, including police protection" (*Miller v State of New York, supra,* at p 510). Public entities, however, are not immune from negligence claims stemming from the performance of their proprietary functions.

Elaborating on this point, the *Miller* court explained that when an entity is acting in these dual capacities, "[its] conduct may fall along a continuum of responsibility to individuals and society deriving from its governmental and proprietary functions. This begins with the simplest matters directly concerning a piece of property for which the entity acting as landlord has a certain duty of care, for example, the repair of steps or the maintenance of doors in an apartment building. The spectrum extends gradually out to more complex measures of safety and security for a greater area and populace, whereupon the actions increasingly, and at a certain point only, involve governmental functions, for example, the maintenance of general police and fire protection. Consequently, any issue relating to the safety or security of an individual claimant must be carefully scrutinized to determine the point along the continuum that the State's alleged negligent action falls into, either a proprietary or governmental category" (*Miller v State of New York, supra,* at pp 511-512).

In the case at bar, one of the specific acts or omissions out of which the injury is claimed to have arisen (*Weiner v Metropolitan Transp. Auth.,* 55 NY2d 175, 182, *supra*) under the common carrier theory of liability, was the failure of the Transit Authority's token booth clerk, or clerks, or other personnel to summon the police to the 125th Street subway station.

The law is settled that as a common carrier, exercising both governmental and proprietary functions (*see, Weiner v Metropolitan Transp. Auth., supra,* at p 182), the Transit Authority is obligated to take reasonable precautions for its passengers' safety and protection. The nature and extent of this duty necessarily depend upon the circumstances of each particular situation and the danger reasonably to be anticipated (*see, Shernov v New York City Tr. Auth.,* 79 AD2d 1021, *affd* 55 NY2d 175; *Amoruso v New York City Tr. Auth.,* 12 AD2d 11; 17 NY Jur 2d, Carriers, §§ 391, 484; *see also, Weiner v Metropolitan Transp. Auth., supra,* at p 181).

Applying the continuity of responsibility test, adumbrated by the *Miller* court (62 NY2d 506, 512, *supra*), we conclude that the Transit Authority's alleged negligent failure to summon the police, obligated as it was to take reasonable precautions as a common carrier for its passengers' safety and protection, falls

into the proprietary category. This allegation of negligence does not implicate the allocation of police resources or actions taken by the Transit Authority in its police protection capacity, functions which, ordinarily, are governmental. Rather this allegation touches upon ownership and care relating to transportation of passengers which traditionally has been carried on through private enterprise, specifically by common carriers, and constitutes a proprietary function when performed by a governmental entity such as the Transit Authority (*see, Miller v State of New York, supra,* at p 513). Consequently, the Transit Authority is not immune from liability, assuming, of course, that liability can be established.

Finally, we note in passing that liability cannot be predicated on Transit Authority Rules and Regulations rule 85, which rule requires the defendant's employees to "take every precaution to prevent * * * injuries to persons". As we have previously stated "[t]he rule * * * contains provisions which constitute a higher than reasonable standard of care" (*Caputo v New York City Tr. Auth.,* 86 AD2d 883) and, consequently, is inadmissible in evidence against the Transit Authority (*see also, Danbois v New York Cent. R.R. Co.,* 12 NY2d 234, 238).

The rules governing summary judgment motions are well settled. Recently, in *Krupp v Aetna Life & Cas. Co.* (103 AD2d 252, 261-262, quoting from *Friends of Animals v Associated Fur Mfrs.,* 46 NY2d 1065, 1067-1068), this court said: "Summary judgment is a drastic remedy and should not be granted where there is any doubt as to the existence of a material and triable issue of fact * * * issue-finding, as opposed to issue-determination constitutes the key to the procedure * * * Summarizing those principles applicable to motions for summary judgment, this State's Court of Appeals has written: 'To obtain summary judgment it is necessary that the movant establish his cause of action or defense "sufficiently to warrant the court as a matter of law in directing judgment" in his favor (CPLR 3212, subd [b]), and he must do so by tender of evidentiary proof in admissible form. On the other hand, to defeat a motion for summary judgment the opposing party must "show facts sufficient to require a trial of any issue of fact" (CPLR 3212, subd [b]). Normally if the opponent is to succeed in defeating a summary judgment motion he, too, must make his showing by producing evidentiary proof in admissible form' ".

Material and triable issues of fact exist, including whether the Transit Authority breached its duty of care owed to its passengers by failing to summon the police upon notification that a

group of students were being attacked and, if so, whether that breach was a proximate cause of Steven's injuries which resulted in his death.

Having concluded that the Transit Authority, acting in its proprietary capacity, is not immune from liability and that material and triable issues of fact exist, the order denying summary judgment to the Transit Authority should be affirmed insofar as appealed from.

LAZER, MANGANO and BROWN, JJ., concur.

Order of the Supreme Court, Kings County, dated February 2, 1984, affirmed insofar as appealed from, with costs.