Pedraza v New York City Tr. Auth. (2022 NY Slip Op 00255)





Pedraza v New York City Tr. Auth.


2022 NY Slip Op 00255


Decided on January 13, 2022


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: January 13, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Judith Gische
Troy K. Webber Angela M. Mazzarelli Peter H. Moulton Bahaati E. Pitt
Appeal No. 14414 Index No. 159366/13 Case Nos. 2020-00343 2020-04417


Index No. 159366/13 Appeal No. 14414 Case No. 2020-00343 2020-04417 

[*1]Jose Luis Melendez Pedraza Also Known as Jose Luis Melendez etc., Plaintiff-Respondent-Appellant,
v
New York City Transit Authority, Defendant-Appellant-Respondent,Metropolitan Transportation Authority et al., Defendants-Respondents.



Defendants appeal, and plaintiff cross appeals from the judgment of the Supreme Court, New York County (Frank P. Nervo, J.), entered October 26, 2020, upon a jury verdict in favor of plaintiff and against defendant New York City Transit Authority (the TA), and the appeals therefrom bring up for review an order, same court and Justice, entered on or about September 17, 2019, that denied the TA's motion pursuant to CPLR 4404 to set aside the jury verdict. Defendants also appeal from an order, Supreme Court, New York County (Judith McMahon, J.), entered on or about November 14, 2018, which declined to sign the TA's order to show cause.




Lawrence Heisler, Brooklyn (Harriet Wong and Anna J. Ervolina of counsel), for appellants-respondents.
Pollack, Pollack, Isaac & DeCicco LLP, New York (Brian J. Isaac of counsel) and Lipsig, Shapey, Manus & Moverman, P.C., New York (Alan M. Shapey of counsel), and Michael H. Zhu, New York, for respondent-appellant.



Mazzarelli, J. 


On October 26, 2012, plaintiff Jose Pedraza was run over by a number 6 subway car entering the Spring Street station. Plaintiff was intoxicated when he entered the station and does not recall how he came to be on the tracks. The train operator, defendant Angel Rivera, testified at trial that the track, as a train leaves the tunnel and enters the Spring Street station, curves to the right. This limited his view. The speed limit in the tunnel is 30 miles per hour, and it was Rivera's custom and practice to apply the brakes when two cars were inside the station, which would result in the train coming to a stop at the marker at the southern end of the station. On the day of the accident, Rivera saw an object on the tracks 100 feet ahead as he entered the station, and he applied the emergency brakes. As the train approached, he realized it was a person, but, even as the train continued to slow, he could not avoid running over plaintiff, who ended up underneath the middle of the third car.
Nicholas Bellizzi, an engineer and former TA employee, testified at trial as an expert on plaintiff's behalf. Bellizzi testified that the Spring Street station curve creates an obstruction limiting the operator's view of the tracks ahead to approximately 115 feet of track. He explained that, because of this limitation, plaintiff, who was found after the accident 180 feet from where the train enters the station, would not have become visible to the operator until the train was 135 feet away. The data recorder for the train showed that as it approached the station, its speed declined from 30 mph to approximately 25 mph and that after it entered the station the emergency brake was activated. Bellizzi testified that, based on Rivera's testimony that when he first saw plaintiff the train was approximately two car lengths, or 80 feet, inside the station, the train's total stopping distance after application of the emergency brake had the train been traveling at 30 mph, would have been 302.8 feet. At 25 mph [*2]the train's total stopping distance would have been 224.5 feet, and if the train had been traveling at 15 mph, the stopping distance would have been 100.4 feet. Bellizzi explained that he reached the total stopping distance by taking the emergency brake stopping distance as published by the TA and adding a certain number of feet representing the distance the train would have travelled during the time it took for the operator to perceive plaintiff on the track and react. He arrived at 302.8 feet as the distance at 30 mph because it takes the train's brakes 250 feet to physically stop the car, and, using 1.2 seconds as the reaction time for the operator, calculated that it takes 52.8 feet for the operator to react and apply brakes. At 25 mph, the reaction time would add 43.8 feet to the published brake stop distance of 180 feet, resulting in a total stopping distance of 224 feet. Bellizzi opined that, based upon those calculations, it would have been impossible for the train, whether travelling at 30 or 25 mph, to stop in 135 feet, the distance between plaintiff and the train when Rivera would have been first able to see him. At 15 mph hour, however, Rivera would have been able to stop, because the calculated stopping distance would be 100.4 feet. Thus, according to Bellizzi, a safe entry speed of the train into the station, beginning one car length before the end of the tunnel, would have been 15 mph.
The TA argues that this testimony by Bellizzi failed to establish that it was negligent, and that the verdict should have been rejected by the trial court as being based on insufficient evidence. This is because, the TA claims, Bellizzi's conclusions were essentially arbitrary. It contends that Bellizzi worked backwards, taking the spot where plaintiff was struck and calculating how slowly the train would have had to be going to stop in time. It argues that what Bellizzi was required to do was to point to evidence such as a treatise, industry standard, or article that would have established an objective, non-random basis for his testimony that a train needed to slow down to 15 mph when entering the curved track within the Spring Street station.
We disagree. It is not in dispute that the curve limited the train operator's ability to see what was in front of him, in comparison to a straight stretch of track. It is also not in dispute that the slower a train travels, the faster it will come to a stop. Bellizzi's calculations about how many feet the train would travel after the operator applied the brakes when traveling at a particular speed were not disputed, and, indeed, were based on the TA's own published charts. In other words, Bellizzi established prima facie that it was negligent for the TA not to take into account the impairment of a train operator's ability to see what was ahead of him in determining appropriate speeds at train stations with curved tracks. This is different from Buchholz v Trump 767 Fifth Ave., LLC (5 NY3d 1 [2005]), one of [*3]the cases the TA relies on in advocating for an objective standard. In that case, the Court of Appeals held that the plaintiff's expert could not establish that the defendant, the owner of a building whose glass window the decedent fell through, was required to use tempered glass or a protective barrier bar across the pane, because the expert did not point to any evidence that at the time the building was constructed good and accepted engineering and building safety practices called for such measures to be taken. Here, in contrast, the notion that obstructed vision calls for reduced speed in an area where it is not completely unforeseeable that a person will fall onto the track is not one that calls for anything other than the application of the basic laws of physics.
Seong Sil Kim v New York City Tr. Auth. (27 AD3d 332 [1st Dept 2006], lv denied 7 NY3d 714 [2006]) is also distinguishable. There, the question was whether a train operator who had been warned that there was a person on the track should have proceeded with "caution," which would have required him to reduce his speed from the posted limit of 25 mph to approximately 10 to 15 miles per hour, or with "extreme caution," meaning operating the train at no more than 10 mph through the area where the person was reported to be. This Court held that the plaintiff, who alleged that she was struck by the train in question, failed to establish negligence because Bellizzi, who was also the expert in that case, failed to point to any industry standard suggesting that it was not appropriate for the operator to proceed with ordinary "caution." However, there is a measurable difference between that situation, where the question is what degree of caution within a very narrow range was appropriate under the circumstances, and the one presented here, where the argument is that, in a situation where the chances of a collision were already heightened by the vision-obstructing curve, no cautionary measures were required at all.
The TA did not call to the stand any witnesses to challenge plaintiff's theory of liability. Under the circumstances, since we find that plaintiff presented sufficient prima facie evidence of the TA's negligence, an affirmance of the verdict would ordinarily be appropriate. However, the TA claims that it did not call the witnesses it planned to because of unreasonable limitations the trial court placed on that testimony. The testimony the TA witnesses would have presented at trial was previewed in affidavits that they submitted in support of an eve-of-trial motion to dismiss the case. That motion was premised on the TA's position that it was entitled to qualified immunity.[FN1] The doctrine of qualified immunity provides that, where government officials are clothed with the authority to make planning decisions with regard to infrastructure, courts will not permit those decisions to be questioned if they have "a 'reasonable basis' in safety and efficiency considerations" (DeLeon v New York [*4]City Tr. Auth., 305 AD2d 227, 228 [1st Dept 2003], quoting Weiss v Fote, 7 NY2d 579, 589 [1960]). Two of the witnesses who submitted affidavits were planning officials at the agency. One of the officials, Glenn Lunden, averred that he had coordinated a 2011 analysis of proposed legislation reducing train speeds when entering stations and that the study had concluded that doing so would have an outsize negative effect on the entire system, reducing capacity dramatically, increasing run times, causing station overcrowding, and driving operating costs up significantly. Lunden further stated that, in 2018, he conducted an analysis of the effect of reducing train speeds to 15 mph at the Spring Street station, and concluded that this would significantly reduce capacity on the Lexington Avenue Line and have residual effects on the entire system.
The TA also submitted an affidavit by Antonio Cabrera, a founding member of its Speed Policy Committee, which evaluates proposed changes to operating speeds, approves or recommends revisions to rules regarding maximum speeds, and recommends solutions that meet the Speed Policy Standards. Cabrera stated that the committee concluded in 1989 (and again in 1994), that entry into a station at the "normal speed" of 30 mph was appropriate. Cabrera also averred that the Spring Street station's curve is not unique and that at least 50 other stations have sharper curves, including the entrances to Union Square and Grand Central. Mukesh Patel, a TA employee who, among other things, analyzes train run times and helps to develop train control designs, submitted an affidavit in which he explained that the Speed Policy Committee had never identified at the Spring Street station any of the dangerous conditions that ordinarily call for an exception to the general rule that trains enter stations at the speed at which they were traveling in the tunnel. Patel also explained that none of the more sharply curved stations in the system require slower speeds and that a reduction in speed into Spring Street and other curved stations would have a "major destructive impact" on overall subway operations.
Finally, the TA proffered an expert affidavit by Kenneth Korach, the president of Transportation Resource Associates, Inc., which consults to the transportation industry, with a specialty in train safety. Korach's company consults to mass transit agencies throughout the United States, and he averred that there was no industry standard requiring reduction in speed of entry into a station in the manner claimed by plaintiff and that he was "unaware of any operational basis, scientific evidence, or statistical analysis which suggests that a 10 or 15 MPH speed limit for trains entering stations that are located on or prior to curves in the track is safer than [the TA]'s current practice."
The court denied the motion to dismiss, finding that it was essentially an untimely summary judgment motion. Then, just before trial, after a jury had been [*5]impaneled, plaintiff moved in limine to preclude the TA from calling the four witnesses who supported its motion to dismiss. Plaintiff argued that the only relevant consideration in the case was the Spring Street station and that any evidence concerning other sections of track anywhere in the system was irrelevant. The court granted the motion to the extent of precluding Korach from relying on the protocols of transit systems in other cities, stating that "[t]he focus and concern must remain on the Spring Street station here in New York." The court explained that it was not precluding Korach completely but that it would require an offer of proof with respect to whatever he intended to testify about. The court limited Lunden's testimony to the effect that slower speeds at Spring Street would have on the Lexington Line only, not the entire subway system, finding that testimony about the latter would be "too general and vague." The court did not entirely preclude the TA from calling its other witnesses, but ruled that they could only testify about the effect of speed limitations at the Spring Street station and on the Lexington Avenue Line, and not the entire subway system. The court would admit testimony opining that the curve at Spring Street is not unique and does not warrant speed reductions below "normal speed."
The TA did not call any of the witnesses who supported its motion to dismiss and its motion in limine. Plaintiff moved for a missing witness charge as to the TA witnesses. The TA argued that it had identified the witnesses in support of its argument that changing speeds would have system-wide effects, a theory the court precluded it from arguing. The court decided that missing witness charges would be given as to Lunden and Cabrera but not as to Patel, the witness who had opined that the Spring Street station was not unique in its curvature.
We find that the trial court unreasonably curtailed the scope of testimony that the TA's witnesses would be permitted to present in support of the TA's position that liability was barred by qualified immunity. In DeLeon (305 AD2d at 228), where the plaintiff argued that the train that hit him when he fell onto the subway tracks should have entered the station at a speed lower than that posted for travel in the tunnel, this Court affirmed a grant of summary judgment to the TA on the basis that its speed policy decisions were entitled to qualified immunity. That conclusion was supported by an affidavit by a member of the TA's Speed Policy Committee, as well as "expert affidavits
. . . to the effect that the 20 miles per hour policy urged by plaintiff's expert is contrary to universally accepted rapid transit system operating practice and has no engineering logic or scientific basis" (id. at 228 [emphasis added]). This Court held that it was "satisfied that defendant ha[d] 'entertained and passed on the very same question of risk' that plaintiff would put to a jury, and ha[d] adopted a policy with respect [*6]thereto that has a 'reasonable basis' in safety and efficiency considerations" (id.). Accordingly, "the doctrine of qualified immunity applie[d], and defendant [could not] be held liable on the ground that the train should have reduced its speed as it entered the station" (id.).
In Chase v New York City Tr. Auth. (288 AD2d 422 [2d Dept 2001], lv denied 98 NY2d 611 [2002]), the Second Department invoked qualified immunity in reversing the denial of the TA's motion to set aside a jury verdict finding it liable for the injuries of a person who fell on the tracks and who argued, like plaintiff, that the train should have reduced its speed before it entered the station. The Court found that the TA "not only considered and passed on the issue of train speed, but that it also duly adopted a speed policy which is reasonably based, taking into account both safety concerns and the efficient running of a transportation system which serves millions of passengers every year" (288 AD2d at 424 [internal quotation marks and citations omitted]). In Stevens v New York City Tr. Auth. (288 AD2d 460 [2d Dept 2001]), the Second Department reversed an order precluding the TA from raising the doctrine of qualified immunity in a case where the plaintiff was hit by a subway train, stating that "the designated speed limits for each segment of the track . . . are the product of a complex series of decisions and considerations" and that "[t]he decisions of the Speed Policy Committee, an expert planning body, are neither arbitrary nor unreasonable, and are to be preferred over a verdict rendered by a panel of lay jurors" (288 AD2d at 462).
The evidence that the TA proffered, and that the trial court precluded, suggested that it may have been entitled to qualified immunity. As in DeLeon, Korach's testimony indicated that the TA's speed policy was consistent with "universally accepted rapid transit system operating practice" (305 AD2d at 228). Accordingly, Korach should have been permitted to testify about the policies that other rapid transit systems have in place with respect to speed restrictions in subway and train stations, including in cases where those stations are situated on curved sections of track. Further, as in Chase, the testimony that the TA's own witnesses would have given was designed to demonstrate that the speed policy enabled the "efficient running of a transportation system which serves millions of passengers every year" (288 AD2d at 424). This language suggests that the trial court's decision to limit evidence of speed policy decisions to their effects on a particular subway line was too restrictive, since the cases applying qualified immunity in subway speed cases take into account the effects that slower speeds would have on the entire subway system. Turturro v City of New York (28 NY3d 469 [2016]), on which plaintiff relies, does not require a different result. There, the Court of Appeals held that it was not irrational for a jury to find that the City [*7]had not conducted an adequate investigation that could serve as the predicate for a finding that it was immune from liability. The case involved an accident on a street in Queens, after the City had received complaints over a course of several years that speeding on that particular street was a recurrent problem. The City sought qualified immunity on the basis of an investigation it had conducted that studied speeding at particular intersections located on the subject boulevard. The plaintiffs argued that only an investigation into the entire roadway, and that considered the possibility of implementing "traffic calming" measures, could have addressed the problem. The Court found that the jury could reasonably have concluded from the expert testimony that only the type of investigation identified by the plaintiffs would have been appropriate and that the City's failure to perform it precluded its reliance on qualified immunity.
Plaintiff argues that Turturro bars the TA from claiming qualified immunity because, while its speed studies looked at the overall system, they did not specifically investigate whether the curve at the Spring Street station necessitated that trains slow down upon entering the station. However, there is no indication that, as it was in Turturro, the TA was on specific notice of the hazard identified by plaintiff so that it should have known to perform a dedicated study of the issue (28 NY3d at 480). In addition, according to the TA's witnesses, the speed studies that they were prepared to testify about took into consideration the effect that any speed reductions, including for trains entering stations, would have on the entire subway system. The TA, presumably knowing the configuration of each station in the system, was aware when it conducted those studies that Spring Street and other stations in the system had curves that limited train operators' ability to see. Thus, at the very least, the jury should have had the opportunity to determine whether it was reasonable for the TA to rely on those studies, without having to conduct specialized studies of the curved stations within the system.
Even if the TA ultimately is able to establish through the testimony of its witnesses and other evidence that it is entitled to qualified immunity, we conclude that it is not entitled under any circumstances to the shield of governmental function immunity. That form of immunity arises out of a municipality's purely governmental, as opposed to proprietary functions, and protects decisions that were made in the exercise of governmental discretion (see Valdez v City of New York, 18 NY3d 69, 75-76 [2011]). However, claims arising from ownership and care relating to transportation of passengers, which traditionally has been operated by private enterprise, implicate a proprietary function when performed by a governmental entity (such as the TA) (see Crosland v New York City Tr. Auth., 110 AD2d 148 [2d Dept 1985], affd 68 NY2d 165 [1986]). Thus[*8], governmental function immunity does not apply.
Accordingly, the judgment of the Supreme Court, New York County (Frank P. Nervo, J.), entered October 26, 2020, upon a jury verdict in favor of plaintiff and against defendant New York City Transit Authority (the TA), and the appeal and cross-appeal therefrom bringing up for review an order, same court and Justice, entered on or about September 17, 2019, to the extent it denied the TA's motion pursuant to CPLR 4404 to set aside the jury verdict, should be reversed, in the exercise of interest of justice jurisdiction (CPLR 4404[a]), without costs, the judgment vacated, and the matter remitted for a new trial. The appeal from the order should be dismissed, without costs, as subsumed in the appeals from the judgment. The appeal from the order, Supreme Court, New York County (Judith McMahon, J.), entered on or about November 14, 2018, which declined to sign the TA's order to show cause, should be dismissed, without costs, as taken from a nonappealable order.
Judgment, Supreme Court, New York County (Frank P. Nervo, J.), entered October 26, 2020, upon a jury verdict in favor of plaintiff and against defendant New York City Transit Authority (the TA), and appeals therefrom bringing up for review an order, same court and Justice, entered on or about September 17, 2019, reversed, in the exercise of interest of justice jurisdiction (CPLR 4404[a]), without costs, the judgment
vacated, and the matter remitted for a new trial. The appeal from the order, Supreme
Court, New York County (Judith McMahon, J.), entered on or about November 14, 2018, which declined to sign the TA's order to show cause, dismissed, without costs, as taken from a nonappealable order.
Opinion by Mazzarelli, J. All concur.
Gische, J.P., Webber, Mazzarelli, Moulton, Pitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: January 13, 2022



Footnotes

Footnote 1: The TA did not plead qualified immunity as an affirmative defense in its answer; however, neither did plaintiff argue that the TA waived the defense pursuant to CPLR 3018(b). We further note that the complaint did not allege that the TA was negligent in not setting a slower speed limit for the station; to the contrary, it alleged that "Rivera entered the station slowly."