=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 225
In the Matter of Mark Ford, et
al.,
            Appellants,
         v.
New York State Racing and
Wagering Board,
            Respondent.


            Andrew J. Turro, for appellants.
            Kathleen M. Arnold, for respondent.


LIPPMAN, Chief Judge:

        State agencies legislatively charged with regulating

and supervising pari-mutuel horse racing have for decades taken

measures to prevent horses from racing under the influence of

drugs administered solely to boost equine speed beyond an

- 1 -

animal's natural capability.  Prominent among these has been race day sampling of the blood and/or urine of competing horses to test for the presence of prohibited doping agents, a practice specifically authorized by respondent's enabling legislation (Racing, Pari-Mutuel Wagering & Breeding Law [hereinafter "Racing Law"] § 301 [2] [a]).

The present litigation has concerned the validity of a rule first promulgated by respondent in 2009 in response to the introduction into the equine pharmacopeia of a new generation of doping agents capable of enhancing equine race speed while eluding race day detection.  That rule, referred to as the Out of Competition Testing Rule (OCTR) (9 NYCRR § 4120.17[1]), required respondent's licensees, among them petitioner standardbred owners and trainers, to make the harness race horses they train and/or own available to respondent's veterinarians for random blood and urine sampling at points temporally and spatially removed from any particular race in which they were to compete.  Petitioners commenced this hybrid article 78/declaratory judgment proceeding in advance of the rule's effective date, alleging, among other things, that equine drug testing without a nexus to the test subject's participation in a specific, soon-to-be-run race is not authorized by respondent's enabling legislation and would, if instituted, entail constitutionally unreasonable intrusions upon

_____

[1]A separate rule providing for out-of-competition drug testing of thoroughbred race horses (9 NYCRR § 4043.12) has not been challenged.

off-track farms stabling race horses, some of which are owned by persons not subject to respondent's licensing jurisdiction.

The petition was granted by Supreme Court which found, in essential part, that respondent had, in mandating out-of-competition race horse drug testing, acted in excess of its legislatively delegated power.  The Appellate Division, however, modified, effectively denying the petition, except as it bore upon one OCTR provision not here at issue (i.e., 9 NYCRR 4120.17 [e] [3]).  The court found the rule otherwise valid to the extent challenged (107 AD3d 1071 [2013]), holding that the rule's promulgation lay within respondent's  broad, legislatively conferred authority to regulate and supervise race meets at which pari-mutuel wagering was permitted (id. at 1073).  The court also upheld specific provisions of the rule against petitioners' claims that they were not rationally related to any legitimate regulatory objective and that the rule's prescribed penalty for illicit doping was so severe as to be legally offensive (id. at 1073-1077).  In deeming the OCTR for the most part valid, the Appellate Division necessarily rejected petitioners' contention that the warrantless intrusions contemplated by the rule -- by a sampling veterinarian into off-track stables possibly owned by persons not subject to respondent's licensing jurisdiction -- constituted constitutionally offensive privacy invasions (id. at 1076).  The matter is now before us on petitioners' appeal as of right pursuant to CPLR 5601 (b) (1).

While the appeal lies, our scope of review is significantly narrowed by the circumstance that, during the appeal's pendency, in August 2014, the challenged rule was extensively amended, partly in response to petitioners' objections.  Although petitioners are unmollified by the amendments, their present arguments, insofar as directed at specific provisions of the originally promulgated OCTR, are pervasively mooted by the rule's overhaul, and the amended rule, the validity of which has not to date been adjudicated, is not yet the proper subject of any appeal, much less one to this Court.[2]  We do not then pass upon particular provisions of the rule, either in its original or amended iteration, but confine our review to the independently determinable and potentially decisive issues raised and litigated as to whether there are legal grounds for respondent's promulgation of any rule mandating out-of-competition race horse testing, and whether a testing regimen of the sort proposed would of necessity involve constitutionally unreasonable intrusions by repondent's agents. To the former inquiry we answer, "yes," and to the latter, "no." We accordingly affirm as the Appellate Division reached the same conclusions.

---

[2]Indeed, we are advised that a new petition challenging the amended OCTR has only just been served.

I.

Respondent's rationale for requiring out-of-competion testing is set forth in the affidavit of George A. Maylin, DVM, the Director of the New York State Racing and Wagering Board Drug Testing and Research Program since 1971, and a highly regarded expert in the field of equine pharmacology.  Dr. Maylin explains that, while, historically, it had been possible effectively to detect and thereby deter the use of prohibited horse doping agents through race day sampling of race entrants, a regulatory loophole was created when protein-based drugs came into use as equine speed enhancers.  According to Dr. Maylin, those powerful new doping agents, capable of turning even naturally lame horses into race competitors, could, unlike their antecedents, be administered long before the race whose running they would affect, and by reason of the lengthy interval between date of administration and the date of competition, escape race day detection in equine blood and urine.  Unless, then, race horses were tested closer to the date of drug administration -- which, in the case of illicit doping, would, by design, be well in advance of any race day screening -- the new doping agents could and likely would be used with impunity.  And, in that event, race horses would, at great risk to their own well-being and that of their jockeys, be pharmacologically enabled, and under extraordinarily stressful racing conditions impelled, far beyond their natural capabilities, solely to bestow an unfair, and indeed anti-competitive advantage on unscrupulous owners and

trainers.  The threat posed to the integrity of state sponsored pari-mutuel racing by this entirely practicable and, in Dr. Maylin's judgment, already recurrent scenario was assertedly palpable.

While petitioners claim that there are race-day tests capable of detecting the kinds of doping agents targeted by out-of-competition testing and that out-of-competition testing is therefore unnecessary, the tests cited by petitioners are exceedingly costly and evidently of undemonstrated efficacy in detecting evidence of doping agents administered well in advance of competition.[3]  The existence of tests of such uncertain general utility does not stand in the way of concluding that the relevant requirement of a rational basis for respondent's determination to mandate out-of-competition testing (see Kuppersmith v Dowling, 93 NY2d 90, 96 [1999]; New York State Assn. of Counties v Axelrod, 78 NY2d 158, 166 [1991]) was met. Notably, petitioners' experts, while faulting respondent's pre-amendment OCTR for overbreadth and vagueness in its definition of "prohibited substances" and for arbitrariness in its prescription of a 180-day pre-race test window, do not appear to dispute the

_____

[3]For example, although in Matter of Laterza v N.Y.S. Racing & Wagering Bd. (68 AD3d 1509 [3d Dept 2009]), race-day sampling was, after a series of complex and extremely expensive laboratory procedures, successfully used to establish that protein-based doping agents had at some point, perhaps near in time to the race, been given the animal, the case cannot be cited as instancing a present capability reliably to detect the relatively remote administration of such doping agents.

essential point of the Maylin affidavit -- that out-of-competition testing is, in some form, now necessary to insulate horse racing and accompanying pari-mutuel wagering from the hazardous and corrupting effects of modern horse doping. Respondent, we note, is not alone in embracing out-of-competition equine drug testing as a necessary regulatory counter to the new generation of horse doping agents. Racing authorities in other major horse racing jurisdictions, including Illinois, Indiana, Kentucky, New Jersey and New Mexico, have issued OCTRs reflecting a similar judgment as to the importance of out-of-competition testing to the future of state sponsored equine racing and wagering (see Ill. Admin. Code 603.200; 71 Indiana Admin. Code 8-3-5; 810 Kentucky Admin. Regs. 1:110; New Jersey Admin. Code 13:70-14A.13; New Mexico Admin. Code 15.2.6).

## II.

Petitioners nonetheless maintain that, even if out-of-competition testing is, at least in concept, a reasonable means of achieving a proper agency purpose, it cannot, given the scope of respondent's legislatively delegated authority, be permissibly mandated by respondent through agency rule making. This contention rests essentially on language from two statutes: Racing Law §§ 301 (2) and 902 (1).[4] The former provides:

---

[4]These statutes were amended in 2012 (L 2012, c 60) to effect the merger of respondent New York State Racing and Wagering Board into the State Gaming Commission. This matter has

"2. <u>Without limiting the generality of the foregoing,</u>[5] <u>and in addition to its other powers</u>:

"a. The state racing and wagering board shall prescribe rules and regulations for effectually preventing the use of improper devices, the administration of drugs or stimulants or other improper acts for the purpose of affecting the speed of harness horses <u>in races in which they are about to participate</u>" (emphasis supplied).

And the latter:

"1. In order to assure the public's confidence and continue the high degree of integrity in racing at the pari-mutuel betting tracks, <u>equine drug testing at race meetings</u> shall be conducted by a state college within this state with an approved equine science program."

———————————

been litigated on the basis of the statutes as they read at the time of the original OCTR's promulgation and we, accordingly, quote the statutes as they read before their amendment. The pre- and post-amendment versions do not, in any event, differ in respects material to the substantive issues presently raised.

[5]The "foregoing" here refers to the statute's first subsection, which says:

"1. Pursuant to the provisions of sections two hundred twenty-two through seven hundred five of this chapter, the state racing and wagering board shall have power to supervise generally all harness race meetings in this state at which pari-mutuel betting is conducted. <u>The board may adopt rules and regulations not inconsistent with sections two hundred twenty-two through seven hundred five of this chapter to carry into effect its purposes and provisions and to prevent circumvention or evasion thereof</u>" (emphasis supplied).

Petitioners reason that section 301 (2) (a)'s reference to respondent's authority to prescribe rules prohibiting the administration of drugs "for the purpose of affecting the speed of harness horses in races in which they are about to participate" and section 902 (1)'s designation of an official tester "at race meetings" together demonstrate that the Board's testing authority is statutorily limited to horses competing at race meetings.

Petitioners, we think, over-read these provisions. While it is true that an administrative agency within the executive branch may not under the guise of rule-making engage in basic policy determinations reserved to the Legislature (Rent Stabilization Assn. of New York v Higgins, 83 NY2d 156, 169 [1993], cert denied 512 US 1213 [1993]), it is also true that the Legislature "has considerable latitude in determining the reasonable and practicable point of generality in adopting a standard for administrative action and, thus, [that] a reasonable amount of discretion may be delegated to . . . administrative officials" (Brightonian Nursing Home v Daines, 21 NY3d 570, 579 [2013] [internal quotation marks and citations omitted]).  Here, the Legislature, in drafting Racing Law § 301 (2), was at pains to be explicit that that subsection was not to be construed as a limitation upon respondent's powers "to supervise generally all harness race meetings in this state at which pari-mutuel betting is conducted" and in that connection to "adopt rules and

regulations . . . to carry into effect its [respondent's] purposes and provisions <u>and to prevent circumvention or evasion thereof</u>" (Racing Law § 301 [1]).  Thus, not only does section 301 when read in its entirety make plain that the Legislature had no purpose of restricting respondent's general supervisory power over pari-mutuel harness race meetings, but it specifically authorizes regulatory action to prevent the circumvention or evasion of existing rules, necessarily including those whose object, sensibly understood, is "effectually" to prevent horses from racing under the influence of speed-enhancing doping agents. Out-of-competition drug testing, which, as noted, has as its raison d'etre the plugging of a loophole created in the pre-existing regulatory regimen by the introduction of doping agents capable of affecting competitive performance while eluding race day detection, is precisely the sort of measure contemplated by section 301 (1).  As for section 902 (1), it too has no apparent limiting purpose -- its designation of a laboratory to perform equine drug testing at race meetings does not reasonably signify that such testing may be required by respondent only at race meetings.

Indeed, respondent's legislatively delegated authority over horse racing and attendant pari-mutuel activities has historically been well nigh plenary.  When the challenged rule was first promulgated, Racing Law § 101 (1), incorporating language from a predecessor enabling provision dating from 1973

(L 1973, ch 346, § 3), vested in respondent "general jurisdiction over all horse racing activities and all pari-mutuel activities, both on track and off-track . . ., in the state and over the corporations, associations, and persons engaged therein."[6] Respondent's power effectively to reach off-track activity, such as horse doping, bearing directly on the safety and integrity of pari-mutuel racing, seems to us unarguable.

### III.

Petitioners' claim, that respondent's original OCTR facially infringed the constitutionally protected privacy rights of persons stabling race horses chosen for testing, is unreviewable since, as noted, the initial OCTR has been substantially superceded.  To the extent, however, that petitioners may be understood to argue that warrantless, out-of-competition equine testing pursuant to an administrative regulatory scheme is categorically incompatible with the constitutional prohibition against unreasonable governmental searches, their argument is reviewable, but unavailing. Respondent's licensees, having voluntarily entered a pervasively regulated field of commercial endeavor[7] in which suspicionless

---

[6]Although § 101 was repealed in 2012, after the rule at issue was promulgated, its relevant provisions were reenacted in Racing Law §§ 104 (1), (4) and (19).

[7]That horse racing and accompanying pari-mutuel wagering are closely regulated in New York and elsewhere has been often noted

equine testing has for decades been used as a routine, legally
mandated prophylactic, can claim no privacy expectation that
would prevent respondent from testing their race horses' blood
and urine for illicit, speed-enhancing substances in accordance
with a prescribed testing regimen meaningfully limiting the scope
of any intrusion incident to the sampling procedure (see New York
v Burger, 482 US 691, 702 [1987]; People v Quackenbush, 88 NY2d
534, 541-543 [1996]).  And, although private horse farm owners
not similarly subject to pervasive regulation ordinarily retain a
reasonable expectation that government agents will not intrude
upon their property except with their consent or pursuant to a
warrant, when they enter into commercial arrangements pursuant to
which race horses owned or trained by respondent's licensees are
stabled on their property, they may reasonably be deemed to have
relinquished a privacy-based objection to the very closely
circumscribed property intrusion that will foreseeably occur
incident to an appropriately focused out-of-competition testing
regimen.  The intrusion contemplated by such a testing regimen is
not one into any residential or otherwise notably private space,
but a highly focused, guided and brief veterinary foray into
leased commercial stabling areas  (cf. Anobile v Pelligrino, 303
F3d 107, 120-121 [2d Cir 2001] [administrative search warrant
exception inapplicable to search of race-track dormitories used

_____

(see e.g. Anobile v Pelligrino, 303 F3d 107, 111 [2d Cir 2001];
Dimeo v Griffin, 943 F2d 679, 681 [7th Cir 1991]).

as residences]) with the object, not of discovering evidence of criminal activity (cf. People v Scott, 79 NY2d 474 [1992]), but of sampling, exclusively for regulatory enforcement purposes, the blood and urine of a specifically identified race horse.  The horse farm owner has, by hypothesis, leased stable space to respondent's licensee for the habitation of a race horse and, in so doing, must have understood that the horse would from time to time be attended at the stable by a veterinarian.  We do not think that such a visit, particularly when conducted in accordance within a duly constraining regulatory framework, will generally implicate a privacy interest triggering the requirement of a warrant or prior consent by the stable owner.

In sum, we hold no more than that respondent possesses the power to promulgate rules mandating warrantless, out-of-competition equine testing for proscribed doping agents.  Accordingly, the order of the Appellate Division should be affirmed, with costs.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order affirmed, with costs.  Opinion by Chief Judge Lippman. Judges Read, Smith, Pigott, Rivera and Abdus-Salaam concur.

Decided December 18, 2014