Bouchard v State of New York (2022 NY Slip Op 04202)

Bouchard v State of New York

2022 NY Slip Op 04202

Decided on June 30, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 30, 2022

533062
[*1]Stephane Bouchard et al., Appellants,
v
State of New York, Respondent.

Calendar Date:April 27, 2022

Before:Clark, J.P., Pritzker, Colangelo, Ceresia and McShan, JJ.

Martin, Harding & Mazzotti, LLP, Albany (Peter P. Balouskas of counsel), for appellants.
Letitia James, Attorney General, Albany (Jonathan D. Hitsous of counsel), for respondent.

McShan, J.
Appeal from an order of the Court of Claims (Milano, J.) entered March 9, 2021, which granted defendant's motion for summary judgment dismissing the claim.
Claimant Stephane Bouchard sustained several injuries while competing in a harness horse race at the Saratoga Hotel and Casino racetrack. Bouchard was injured when he was ejected from his sulky after his horse, Sporty Big Boy, collided with another horse, Mister Miami, that had fallen during the race. Bouchard and his spouse, derivatively, thereafter brought this claim against defendant to recover damages for injuries sustained by Bouchard in connection with the accident, alleging that the New York State Gaming Commission (hereinafter the Commission) created a dangerous condition when its officials negligently performed their prerace safety inspections, which would have alerted them to the potential danger in allowing Mister Miami to participate in the race. Defendant moved for summary judgment, asserting that claimants failed to show that the regulations created a special duty to racehorse drivers and, alternatively, that the discretionary decision concerning potential disqualification of Mister Miami is entitled to immunity. Defendant further contended that claimants' action is barred by the doctrine of primary assumption of risk and, alternatively, that there is no evidence that Commission officials had actual or constructive notice of the dangerous conditions. Ultimately, the Court of Claims granted the motion, determining that the Commission was exercising a governmental function in regulating the harness race in which Bouchard was injured and, accordingly, claimants were required to show that defendant owed a special duty to claimants, which they failed to do. This appeal ensued.
Claimants assert that the Commission's oversight of harness racing was a proprietary function and that defendant must therefore be held to an ordinary negligence standard (see Applewhite v Accuhealth, Inc., 21 NY3d 420, 425 [2013]; Feldman v Port Auth. of N.Y. & N.J., 194 AD3d 137, 140 [2021]). Although claimants did not specifically oppose defendant's summary judgment motion on this basis, the inquiry as to whether a governmental entity is engaged in a proprietary function as opposed to acting in a governmental capacity is a question of law which must be addressed when a negligence claim is brought against that entity (see Goldman & Assoc., LLP v Golden, 115 AD3d 911, 912-913 [2014]; Vanship Holdings Ltd. v Energy Infrastructure Acquisition Corp., 65 AD3d 405, 408 [2009]; see also Moore v Del-Rich Props., Inc., 151 AD3d 1817, 1818-1819 [2017]). We may therefore reach the merits of claimants' contention.
"A government[al] entity performs a purely proprietary role when its activities essentially substitute for or supplement traditionally private enterprises" (Applewhite v Accuhealth, Inc., 21 NY3d at 425 [internal quotation marks and citation omitted]; see Marks-Barcia v Village of Sleepy Hollow Ambulance [*2]Corps, 183 AD3d 883, 884 [2020], lv denied 35 NY3d 915 [2020]). "Conversely, a [governmental entity] will be deemed to have been engaged in a governmental function when its acts are undertaken for the protection and safety of the public pursuant to the general police powers" (Ferreira v City of Binghamton, ___ NY3d ___, ___, 2022 NY Slip Op 01953, *3 [2022] [internal quotation marks and citations omitted]; accord Santaiti v Town of Ramapo, 162 AD3d 921, 923 [2018]). "Classification of a particular municipal activity as governmental depends on several considerations, including whether the activity was historically performed by government, whether it is best executed by government and whether it is undertaken for profit or revenue" (Matter of Karedes v Colella, 100 NY2d 45, 50 [2003] [citation omitted]; see Drever v State of New York, 134 AD3d 19, 25 [2015]).
"When the liability of a governmental entity is at issue, it is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs liability, not whether the agency involved is engaged generally in proprietary activity or is in control of the location in which the injury occurred" (Miller v State of New York, 62 NY2d 506, 513 [1984] [internal quotation marks, brackets and citation omitted]; see Trenholm-Owens v City of Yonkers, 197 AD3d 521, 523 [2021]). "In other words, 'the determination of the primary capacity under which a governmental agency was acting turns solely on the acts or omissions claimed to have caused the injury'" (Turturro v City of New York, 28 NY3d 469, 478 [2016], quoting Matter of World Trade Ctr. Bombing Litig., 17 NY3d 428, 447 [2011], cert denied sub nom. Ruiz v Port Auth. of N.Y. & N.J., 568 US 817 [2012]). To this end, "a governmental entity's conduct may fall along a continuum of responsibility to individuals and society deriving from its governmental and proprietary functions and any issue relating to the safety or security of an individual claimant must be carefully scrutinized to determine the point along the continuum that the governmental entity's alleged negligent action falls into, either a proprietary or governmental category" (P.R.B. v State of New York, 201 AD3d 1237, 1238 [2022] [internal quotation marks, brackets and citation omitted]; see Doe v City of New York, 67 AD3d 854, 856 [2009]).
The gravamen of claimants' claim is that Bouchard suffered injuries as a result of the failure of various Commission employees to inspect, observe, evaluate and scratch Mister Miami from the harness race based upon discoverable equipment defects, as well as Mister Miami exhibiting indications prior to the race that he was "lame." To this end, claimants argue that these omissions altogether created an excessively dangerous condition (see Scozzafava v State of New York, 174 AD3d 1109, 1111 [2019]; T.T. v State of New York, 151 AD3d 1345, 1346 [2017]). It is evident that the Commission's [*3]principal role in harness racing is one of oversight, representative of the broad legislative aims underlying the creation of the Commission (see Racing, Pari-Mutuel Wagering and Breeding Law § 100 et seq; 9 NYCRR 4100 et seq.). Specifically, Racing, Pari-Mutuel Wagering and Breeding Law § 100 states that the purpose of the regulatory structure governing the gaming industry — and, in turn, the Commission — is to safeguard "public confidence and trust" in the gaming industry by, among other things, "ensur[ing], so far as practicable, the exclusion of unsuitable persons or entities from participating in any legalized gaming activity within this state." Moreover, Racing, Pari-Mutuel Wagering and Breeding Law § 301 (1) specifically empowers the Commission to "supervise generally all harness race meetings in this state at which pari-mutuel betting is conducted" (see Matter of Ford v New York State Racing & Wagering Bd., 24 NY3d 488, 497 [2014]).
However, the regulations that govern the conduct of the Commission are indicative of its dual role in the sport of harness racing, with aspects of its duties touching upon both proprietary and governmental functions (see Matter of World Trade Ctr. Bombing Litig., 17 NY3d at 446). In this respect, certain regulations necessarily require that the Commission's employees play an integral role in the racing operation itself; particularly, inspections concerning the fitness and safety of the participating horses prior to each and every race. For instance, the presiding judge who oversees each harness race is empowered to "[c]ontrol the horses, drivers, grooms and every person or machine engaged in any portion of the racing program" (9 NYCRR 4105.6 [e]). The duties of every judge include, among other things, the duty to "[e]xclude from any race, a horse that is improperly equipped, dangerous, unmanageable, unfit to race, or liable to cause accident or injury to another horse or driver in the race or that has fallen upon the track during the program" (9 NYCRR 4105.8 [e]). In the case of the paddock judge, there is a specific duty incumbent on that individual to "[s]upervise the inspection of equipment and shoes; and the head and saddle numbers of each horse during warm ups and before the parade" (9 NYCRR 4105.9 [c]). Further, the state veterinarian present at each race must "[s]upervise the inspection and examination of every horse when first entered at the race meeting" (9 NYCRR 4105.14 [b] [1]). The state veterinarian is also charged with observing the training of each horse set to perform, as well as the horses in the paddock and warming up, and examining those horses that appear ill or infirm in order to report to the presiding judge (see 9 NYCRR 4105.14 [b] [4], [5]). The ultimate decision on whether to scratch a horse on race day lies with the presiding judge, as trainers are foreclosed from doing so on their own after 9:00 a.m. (see 9 NYCRR 4111.11 [c]; 4111.13).[FN1]
Altogether, we find that these responsibilities [*4]in relation to the omissions that allegedly contributed to Bouchard's injury were proprietary and, accordingly, those officials were subject to an ordinary negligence standard when performing those functions (see Wittorf v City of New York, 23 NY3d 473, 480 [2014]; Schrempf v State of New York, 66 NY2d 289, 294 [1985]). In this respect, the role of the various judges and state veterinarian to assess and identify potential issues with horses that are set to participate in any given harness race appreciably differs from those cases presenting more traditional governmental functions, such as police and fire protection (see Matter of World Trade Ctr. Bombing Litig., 17 NY3d at 446; see also Grasso v New York State Thruway Auth., 159 AD3d 674, 677 [2018]) or those evidencing a purely supervisory role (see Metz v State of New York, 20 NY3d 175, 179-180 [2012]; T.T. v State of New York, 151 AD3d at 1346-1347). Rather, the duties of those officials are fundamentally intertwined with the operation of each and every race and, while such tasks may tangentially relate to the overall function of ensuring fair and honest gambling in this state, they are more specifically directed to the goal of ensuring the safety of the participants in those races (see P.R.B. v State of New York, 201 AD3d at 1238-1239; Perlov v Port Auth. of N.Y. & N.J., 189 AD3d 1624, 1627 [2020]; Moore v Del-Rich Props., Inc., 151 AD3d at 1820). Moreover, it is apparent that at least part of the Commission's role in harness racing is to work hand in hand with the private racing industry to further the state's goal of "deriv[ing] a reasonable revenue for the support of government" (NY Const, art I, § 9 [1]; see Matter of Karedes v Colella, 100 NY2d at 50-51; compare Kochanski v City of New York, 76 AD3d 1050, 1052 [2010]). In light of our determination, defendant's remaining contentions pertaining to the existence of a special duty between Bouchard and defendant or the governmental immunity defense are rendered inapplicable, as the ordinary negligence standard must necessarily apply (see Turturro v City of New York, 28 NY3d at 479; Moore v Del-Rich Props., Inc., 151 AD3d at 1820).
Turning to defendant's remaining defenses, on its summary judgment motion defendant also contended that Bouchard had assumed the risks inherent in harness racing, thereby negating any claim of negligence on the part of Commission officials.[FN2] The doctrine of assumption of risk "provides that a voluntary participant in a sporting or recreational activity 'consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation'" (Joseph v New York Racing Assn., 28 AD3d 105, 108 [2006], quoting Morgan v State of New York, 90 NY2d 471, 484 [1997]). "'[I]n assessing whether a defendant has violated a duty of care within the genre of tort-sports activities and their inherent risks, the applicable standard should include whether the conditions [*5]caused by the defendant['s] negligence are unique and created a dangerous condition over and above the usual dangers that are inherent in the sport'" (Grady v Chenango Val. Cent. Sch. Dist., 190 AD3d 1218, 1226-1227 [2021], quoting Morgan v State of New York, 90 NY2d at 485). Further, "it is well established that an inherent risk in sporting events involving horses is injury due to the sudden and unintended actions of the animals, which are large, strong animals that at times are unpredictable" (Tilson v Russo, 30 AD3d 856, 857 [2006] [internal quotation marks, brackets and citations omitted]; see Toro v New York Racing Assn., Inc., 95 AD3d 999, 1001 [2012], lv denied 19 NY3d 810 [2012]; Dalton v Adirondack Saddle Tours, Inc., 40 AD3d 1169, 1171 [2007]).
We find that defendant met its initial burden to establish that Bouchard had assumed the risks inherent in harness track racing (see Toro v New York Racing Assn., Inc., 95 AD3d at 1001). Bouchard testified to his extensive experience in harness track racing at the time of the accident, having participated in over 52,000 races over a 35-year span. Bouchard also noted that he had previously been involved in two accidents that resulted in serious injuries, and that he was aware of the risks inherent in harness racing. To this end, Bouchard acknowledged that he had participated in races in which he had concerns about the fitness of another participant's horse and that he had previously witnessed other horses lose a shoe while racing. Accordingly, the burden shifted to claimants to establish a material issue of fact as to "whether defendant[] breached [its] duty to exercise reasonable care to protect [Bouchard] from unassumed, concealed or unreasonably increased risks" (Schiffman v Spring, 202 AD2d 1007, 1009 [1994] [internal quotation marks and citation omitted]).
Viewing the evidence in the light most favorable to claimants, as we must (see Youmans v Maple Ski Ridge, Inc., 53 AD3d 957, 959 [2008]), we find that claimants have raised triable issues of fact as to whether Commission officials unreasonably increased the risk of injury by failing to supervise the necessary safety inspections and, consequently, allowing Mister Miami to participate in the race (see Valencia v Diamond F. Livestock, Inc., 110 AD3d 1334, 1335 [2013]; Corica v Rocking Horse Ranch, Inc., 84 AD3d 1566, 1567 [2011]; Lipari v Babylon Riding Ctr., Inc., 18 AD3d 824, 825 [2005]; compare Nigro v New York Racing Ass'n, Inc., 93 AD3d 647, 648-649 [2012]). Although Bouchard's extensive experience in harness racing is relevant (see Turcotte v Fell, 68 NY2d 432, 440 [1986]), that experience did not entirely absolve Commission officials of the obligation to ensure that conditions on the racetrack were "as safe as they appeared to be" by observing and removing those horses that had equipment issues or health concerns that could result in increasing the risk of injury to the participants of the race (Sara W. v Rocking Horse Ranch Corp[*6]., 169 AD3d 1342, 1343-1344 [2019]; see Zayat Stables, LLC v NYRA, Inc., 87 AD3d 1063, 1064 [2011]; see also 9 NYCRR 4105.8 [e]). Given the evidence of a failure to supervise the inspection of Mister Miami for health- or equipment-related concerns, together with the various accounts of Mister Miami exhibiting signs of lameness during the prerace warmups, and the uncertainty as to whether there was a noticeable issue with Mister Miami's horseshoes, we find that there are triable issues as to whether Commission officials adequately performed their duties and whether their alleged failures unreasonably increased the risk beyond a level generally inherent in harness track racing (see Zayat Stables, LLC v NYRA, Inc., 87 AD3d at 1064; Rosati v Hunt Racing, Inc., 13 AD3d 1129, 1130 [2004]; Millan v Brown, 295 AD2d 409, 410 [2002]; Brancati v Bar-U-Farm, Inc., 183 AD2d 1027, 1030 [1992]; compare Blumenthal v Bronx Equestrian Ctr., Inc., 137 AD3d 432, 432 [2016], lv denied 28 NY3d 906 [2016]; Tilson v Russo, 30 AD3d at 858; Joseph v New York Racing Assn., 28 AD3d at 108).
Finally, we reject defendant's alternative defense that it lacked actual or constructive notice of any health or equipment issues that may have affected Mister Miami and created a dangerous condition. Here, the regulations governing the conduct of Commission officials present at a harness track race require that they supervise the inspection of each horse set to participate, including its equipment, and identify conditions that would warrant the exclusion of any given horse from a race if it might pose a danger (see 9 NYCRR 4105.9, 4105.14; see also 4105.8). Because these duties were imposed upon the Commission officials by regulation, constructive notice of Mister Miami's health and equipment issues that would have been observable during those inspections may be imputed (see Robles v Time Warner Cable Inc., 167 AD3d 411, 411 [2018]; Weller v Colleges of the Senecas, 217 AD2d 280, 285 [1995]; Watson v City of New York, 184 AD2d 690, 690 [1992]). In so concluding, we find that the Court of Claims should have denied defendant's motion for summary judgment.
Clark, J.P., Pritzker and Ceresia, JJ., concur;
Colangelo, J., not taking part.
ORDERED that the order is reversed, on the law, without costs, and motion for summary judgment denied.

Footnotes

Footnote 1: Defendant contends that the language in the regulations charging the aforementioned officials with "supervising" inspections does not in and of itself suggest that those officials must actually conduct the inspection. Defendant also contends that trainers and drivers bear the responsibility for the inspection of their horses, and that the supervisory functions of the paddock judges and state veterinarian are triggered when information concerning a horse's fitness or equipment is brought to their attention (see 9 NYCRR 4116.11). We reject that contention. The distinct duty to supervise does not suggest that the inspection need not occur, nor that the official's task is meaningless. To the contrary, in the case of the state veterinarian, the regulations suggest that an inspection must take place on every horse, and that the state veterinarian is charged with supervising that inspection (see 9 NYCRR 4105.14 [b] [1]). The mere fact that a trainer or driver is obligated to assess his or her horse for safety concerns does not absolve the judges and the state veterinarian of their specific duties to observe and remove horses that may pose a risk to the race participants.

Footnote 2: Although Supreme Court did not reach defendant's alternative grounds for dismissal on ordinary negligence principles in light of its determination that defendant was performing a governmental function, we note that the issues were fully argued by the parties in their motion papers and we may therefore consider them on this appeal (see Asprou v Hellenic Orthodox Community of Astoria, 185 AD3d 641, 642 [2020]).